CAMPBELL ET UX. *v.* BISHIELDS ET UX.

[No. 139, October Term, 1950.]

*Decided April 13, 1951.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*William L. Wilson, Jr.,* for the appellants.

*Matthew J. Mullaney* for the appellee.

GRASON, J., delivered the opinion of the Court.

The bill of complaint in this case was filed on November 2, 1949, in the Circuit Court for Allegany County, in Equity, by James E. Campbell and Clara M. Campbell, his wife, against Michele Bishields and Congetta Bishields, his wife, for an injunction to restrain the defendants from obstructing a right of way over their land, to which the plaintiffs claim an easement by prescription. An injunction issued on the bill, exhibits, and affidavit thereto. An answer thereto and a motion to dissolve the injunction were filed, testimony taken, and the chancellor, on November 15, 1950, filed a decree dissolving the injunction and dismissing the bill, with costs to defendants, from which this appeal was taken.

It was suggested to the court, before testimony was taken, that Congetta Bishields, the wife of Michele Bishields, was dead, and the testimony shows that she died many years before the institution of this suit, and the case proceeded against Michele Bishields as sole defendant, and, of course, the answer and motion to dissolve the injunction were filed by Michele Bishields.

There was no plat on record of the property here involved, and by agreement of the solicitors a plat, which had been prepared from deeds on record showing how the parties became vested in their respective properties, was admitted in evidence. We request the reporter to file this plat with this opinion.

It appears that in 1896 the New York Mining Company conveyed to James H. Winebrenner a tract of land located at Slabtown, in Allegany County, containing 4.01 acres. The title of the parties hereto comes by mesne conveyances from this deed, and their lands are respectively parts of the land conveyed by that deed. The chain of title shows that on January 21, 1903, Winebrenner conveyed to G. Clinton Uhl $2^{31}/_{100}$ acres of land, and it seems that out of that tract conveyed to Uhl lots were sold, for on May 6, 1903, Uhl conveyed lot No. 4 to Henry Hoenshell (he also being known as Harry Hoenshell) and on this lot Hoenshell built a house of which he died seized and possessed. Uhl, on April 20, 1907, conveyed to Jonas Basey lots Nos. 5, 6, 7, 8, 9 and 10, and on April 20, 1907, Uhl conveyed lots Nos. 1, 2 and 3 to Henry Hoenshell. On June 24, 1911, James Winebrenner conveyed to Joseph Boor the parcel of land shown on said plat and marked tract "A", and on September 15, 1904, Winebrenner conveyed to Mary E. Elliott the lot of ground shown on said plat and marked tract "B"; on September 24, 1912, the New York Mining Company conveyed to Mrs. James Elliott (Mary E. Elliott), Harry Hoenshell and Joseph Boor the piece of ground shown on said plat and marked tract "C", measuring approximately 10 feet in width and 615 feet in length. On August 23, 1913, Boor conveyed to Harry Hoenshell and wife tract "A"; on March 27, 1927, James Elliott conveyed to Marshall Logsdon tract "B" and also his interest in tract "C"; and on June 30, 1939, Logsdon and wife conveyed to Harry Hoenshell and wife tract "B" and his interest in tract "C". After the death of Henry Hoenshell (also known as Harry Hoenshell) by deed dated November 14, 1944, tracts "A", "B" and "C" were deeded

X - DWELLINGS
AREA "D" - LANE OVER WHICH
EASEMENT IS CLAIMED

COPIED BY MATTHEW J. MULLANEY

PLATTED FROM DEEDS - JULIUS CRUSSUM

to Edna Hoenshell, widow, for life, and after her death to Clara Campbell. It appears that after both Henry Hoenshell and Edna Hoenshell, his wife, died, the title in lots Nos. 1, 2, 3 and 4, and tracts "A", "B" and "C", as shown on the plat, vested in their daughter, Clara E. Hoenshell, who married James E. Campbell, and by deed dated November 21, 1947, this property was caused to be conveyed to Clara Campbell and her husband as tenants by the entireties.

On January 20, 1909, lots Nos. 5, 6, 7, 8, 9 and 10 (lot No. 5 at that time being improved) were conveyed to one Pouis Principe, and by mesne conveyances vested in Michele Bishields.

Lot No. 4 is improved by a dwelling occupied by the plaintiffs, and lot No. 5 is improved by a dwelling occupied by tenants of the defendant; lot No. 10 is improved by a dwelling occupied by the defendant, tract "A" is improved by a dwelling occupied by the tenants of the plaintiffs; tract "B" is unimproved, but was improved by a dwelling which was destroyed by fire in 1936. The sign "X" on the plat indicates the approximate location of said improvements. The area shown on the plat as "D" is the roadway in dispute in this case and this roadway has no outlet in the rear of the property, except in so far as it may be possible to join up with the private road marked "C" on the plat, by going across the property of the plaintiffs.

It thus appears that at the time of the institution of this suit the plaintiffs owned lots 1, 2, 3 and 4 and tracts "A", "B" and "C" (tract "C" is spoken of in this case as the lower lane) and the defendant owned lots 5, 6, 7, 8, 9 and 10, and area "D", which is the roadway in dispute.

We have made a careful study of the testimony in this case, which is voluminous, and shall give our conclusions, calling attention to that part of the evidence we think most important.

We are convinced that under all the testimony in the case the plaintiffs and their predecessors in title have used the roadway over the defendant's land here in dis-

pute openly, continuously, adversely, and under a claim of right for over twenty years, and it may be that said use has been made of said land for forty years. Sometime in the past, it does not appear definitely when, the defendant erected a gate over this road where it enters the public highway. Sometimes the gate was shut and sometimes open. When it was shut the plaintiffs opened it and proceeded to their home. There were times when automobiles at the defendant's home (which is located at the corner formed by the public highway and the roadway in question) would obstruct the roadway, and the plaintiffs and others desiring to use the roadway in question blew the horns of their automobiles and people would come out of the defendant's home and remove the automobiles and let them through. There is evidence that the plaintiffs and other people repaired the roadway, but this is vigorously denied on the part of the defendant.

The defendant said the gate which he erected in the fall of 1949 and which he locked, was the fourth gate that he put up to block traffic. The other gates were wooden gates and less substantial and were never locked. The fourth gate was the only gate that constituted a barricade to this road and prevented its use by the plaintiffs and the general public. The evidence seems to show that the three other gates were, from time to time, destroyed or partially destroyed by being run into and broken down, and there was nothing at all to prevent the use of this roadway by the general public. It is true, according to the defendant's evidence, that he and members of his household complained of the use of this roadway across his land by the plaintiffs and the general public, but did nothing to prevent the use of the roadway by them.

Mrs. Campbell testified that in the year 1912 her father had trouble with Bishields concerning his use of this roadway, and she said she gathered from the talk between her father, Mr. Boor, and Mrs. Elliott that Mr. Bishields compromised it and gave them permission to

use the road. There is other testimony in the case that tends to show there was difficulty about using this roadway in 1912 and that around about that time the lower lane or roadway, (tract "C") leading from the highway to the properties shown on the plat as tracts "A" and "B" was purchased from the New York Mining Company. But notwithstanding any compromise that may have been made in 1912, the roadway in dispute (area "D") had been used continuously, openly, notoriously, and under a claim of right by the plaintiffs and the general public, until it was barricaded in the fall of 1949 by Bishields. Since 1912 three gates have been destroyed, and when gates were there the road was used by the plaintiffs and the general public. Sometimes the gate would be open, sometimes closed, and when it was closed it would be opened by the plaintiffs and the general public and they would go through. All this time the defendant knew about it. Bishields testified that he complained about this use and that he could not do anything about it. He testified that he knew that the plaintiffs and other people used the road. He was asked the question:

"And ever since 1912 you have had a gate on that fence or on that road? A. Yes, sir.

"Q. That gate has been closed in that time? A. Yes.

"Q. And anybody who wanted to get in there would have to open the gate to get through? A. Yes, sir, somebody don't close the gate, no one can make them shut them. You couldn't go out and have trouble with them all the time.

"Q. You mean people have gone through and left the gate open? A. Yes, sir."

He said he couldn't help people leaving the gate open.

"Q. You never saw any of these people go back or if you would see them, you wouldn't say anything? A. Well, what is the use, they never listened. Do you have to kill them?"

Mrs. Grace Bridges testified that Mr. Bishields was never that mean "to tell people they couldn't use it".

In the summer or fall of 1949 Mr. Bishields' grandson was struck by an automobile and Bishields then blockaded the road.

We are of opinion the evidence clearly establishes that since the year 1912 the plaintiffs and the general public used the road openly, continuously, adversely and under a claim of right for over twenty years, and thus have acquired a prescriptive easement to use the roadway in question.

"A right of way is an easement appurtenant to an estate owned by the person in whose favor the easement exists. *Tied. on Real Prop.*, § 607. To establish a right of way by prescription the 'evidence should show that the use and enjoyment of the way had been continuous and uninterrupted for at least twenty years before the obstruction complained of and that such user was adverse; that is under a claim of right, with the knowledge and acquiescence of the owner of the land; and the burden of proof is on the party claiming the easement.' " *Gulick v. Fisher*, 92 Md. 353, pages 357, 358, 48 A. 375 at page 376.

"A prescriptive use to a right of way can be obtained if such use is continuous and uninterrupted for twenty years, and is adverse to the ownership of the land." *Hansel v. Collins*, 180 Md. 209, at page 216, 23 A. 2d 686, at page 690; *Smith v. Shiebeck*, 180 Md. 412, 24 A. 2d 795; *Wilson v. Waters*, 192 Md. 221, 64 A. 2d 135; Vol. 10 Maryland Law Review, 272.

The mere fact that a gate has been erected across a roadway, to the use of which one has acquired a prescriptive right, does not destroy such right but merely limits it. *Southern Maryland Agricultural Ass'n v. Meyer, et al.* 196 Md. 31, 75 A. 2d 89.

Does the right of way shown on the plat as tract "C", deeded by the New York Mining Company in 1912 to the plaintiffs' predecessors in title, constitute a reasonably convenient outlet from the plaintiffs' property to the public highway? If such is the case, a court of equity would be without jurisdiction, because the plaintiffs

would not suffer irreparable injury. *Gulick v. Fisher, supra; Smith v. Shiebeck, supra; Southern Md. Agriculture Ass'n v. Meyer, supra.*

There is considerable evidence in the record concerning this lower outlet. It is ten feet wide, undoubtedly rough, and a part thereof runs along a cliff, which makes it dangerous. It runs back to land now owned by the plaintiffs, but in order to get to their house from this lane it would be necessary to cross a field. The evidence discloses that it was used mainly to walk over and not to drive over. A man named Logsdon, and his family, occupied a house on tract "B", until it was destroyed by fire in the year 1936. The house was never rebuilt, and since then tract "B" has been unimproved. It was testified that during Logsdon's occupancy store trucks delivered goods to Logsdon at his house by way of tract "C", and that other people used this roadway. On the contrary there is testimony that this roadway is not fit for use. One witness said he tried it and did some damage to his automobile. Mrs. Campbell said she tried it once, stopped her car and did not complete passing over this roadway, and that that was her only experience in the use of this lane. We are convinced that this lower lane is chiefly used by people on foot and not by those driving automobiles. On the occasion that the Logsdon house burned, in 1936, one witness said he went to the fire and used the lower lane, tract "C". There is no evidence that definitely shows that this lower lane has been used to drive automobiles or trucks over since that time. We have viewed the photograph of part of this lane, which was offered in evidence. Solicitor for appellee thinks it is in a condition where one could reasonably use it, and we infer he means use it by operating an automobile over it. We do not so view the picture. It simply shows tracks made by wheels of an automobile, on an extremely rough way. They did not offer a picture of an automobile or truck passing over this road on that part of the way which witnesses have referred to as a cliff. There is no evidence in the

case that it could be repaired in such a way as to constitute a roadway that one could reasonably use by driving an automobile over it; and neither is there any evidence of what the cost would be to repair it so that it would be a reasonable outlet. The plaintiffs are not required to build a new road.

In *Amelung et. al. v. Seekamp,* 9 Gill. & J. 468, the court held that equity did not have jurisdiction. In dealing with the pleadings in that case, it pointed out what the bill failed to allege, and among other things that it said the bill failed to allege was: "It is not charged that he has no other reasonably convenient outlet from his mills, * * *".

The complainants allege in their bill that they are "without a road to their home, except by using a dangerous and narrow road, and are greatly jeopardized all because of the unlawful acts of the said defendants in closing the said roadway".

In *Gulick v. Fisher, supra,* where testimony was taken, the court affirmed a decree which dismissed the bill. In that case the court found as a fact that the appellant had a reasonably convenient way from his premises, other than the way in question. Here we find that the plaintiffs had no reasonably convenient way from their property. This being so, there is no question that equity had jurisdiction to grant the relief prayed.

As conditions were at the time defendant erected the last gate and locked it, the plaintiffs were entirely isolated. They could not use area "D" or tract "C", and neither could those who wanted to see them socially or on business. In case of fire a fire engine could not get to their home, and in case of sickness a doctor could not get to them. We are of opinion that they are entitled to relief and the decree of the chancellor will be reversed and the case remanded for a decree in conformity with this opinion.

*Decree reversed and case remanded, with costs.*