LEEKLEY *v.* DEWING ET AL.

[No. 232, September Term, 1957.]

56

*Decided May 20, 1958.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND and PRESCOTT, JJ.

*Howard Wood, 3rd,* for the appellant.

*B. Hackett Turner, Jr.,* and *William H. Adkins, II,* with whom were *Edward Turner* and *Henry, Henry & Adkins* on the brief, for the appellees.

HAMMOND, J., delivered the opinion of the Court.

From a decree permanently enjoining him from in any manner obstructing the right of the several appellees to use

a fifteen-foot road across his woodland to the public road in Queen Anne's County from Centreville to Spaniard's Neck for ingress to and egress from their respective properties on foot or by vehicle for all lawful purposes, John Leekley appeals. He claims that, over his objection, equity should not have taken jurisdiction either to issue a preliminary injunction or to hear the case and issue the permanent injunction; that, on his timely motions, the case should have been transferred to a court of law for a determination of title; that the appellees failed to establish easements appurtenant to their respective properties over his woodland; and as an alternative to the last contention, that any easement established is limited to the use of the road for the purpose of hauling timber or firewood.

The bill of complaint alleged that the road was the only reasonably convenient roadway or right of way in existence to the public road from the properties of the appellees; that it has been continuously, notoriously and adversely used by them and by the former owners of their land for over thirty years as a means of ingress and egress; that Leekley has threatened to deny them access to their respective lots by closing the road unless they ask his permission to use it; and that if he does so they will suffer immediate, substantial and irreparable injury and be put to the necessity of instituting a multiplicity of actions to protect their rights. It is clear that equity long has granted a temporary injunction against irreparable damage whether final adjudication was to be made there or in a law court [1] and that where complainant has no other reasonably convenient way, the obstruction of his way constitutes irreparable damage that entitles him to a temporary injunction.[2]

There was no error in the granting of the temporary injunction. The quondam rule that law must decide questions of title to land is far from inflexible, as the later cases make

---

1. *Moore v. McAllister,* 216 Md. 497, and cases therein cited; *Herr v. Bierbower,* 3 Md. Ch. 456; *White v. Flannigain,* 1 Md. 525.

2. *Smith v. Shiebeck,* 180 Md. 412; *Campbell v. Bishields,* 197 Md. 572; *Lichtenberg v. Sachs,* 200 Md. 145; *Shipley v. Caples,* 17 Md. 179; *Moore v. McAllister, supra.*

plain. Where there is no reasonable doubt as to the title or the propriety of equitable action is evident, an equity court may act in cases involving title and enjoin continuing trespasses or declare rights as to ways. *Southern Maryland Agr. Ass'n v. Meyer*, 196 Md. 31, 34; *Potomac Edison Co. v. Routzahn*, 192 Md. 449, 456-458; *Dalton v. Real Estate & Improvement Co.*, 201 Md. 34; *Campbell v. Bishields*, 197 Md. 572; *Moore v. McAllister*, 216 Md. 497; *Lichtenberg v. Sachs*, 200 Md. 145.

The chancellor concluded that "the title of the plaintiffs to the easement claimed over the way in dispute is so clear and free from doubt that there was no reason to require the parties to resort to a court of law to establish legal title * * *." We agree that retention of jurisdiction and final adjudication by the equity court was proper.

The various appellees owned respective parcels north of the Leekley tract over which the disputed road runs. On one of these parcels there is a valuable stand of white pine and a body of water known as Eagle Pond. Another parcel contains valuable timber. North of the northernmost parcels, and between them and the town of Burrisville, where another public road lies, is a marshy stream two hundred to three hundred feet wide, impassable, at least for vehicular traffic, most of the time. On the southernmost parcel of appellees' land, contiguous to the Leekley tract, lived the Watson family for a number of years, from perhaps 1924, but certainly from 1927, until 1944. Portions of this parcel were cultivated and from time to time hogs were raised on it. In 1944 until some time in the 1950s the Watson family gathered fruit from trees on their lot and sold it to pay the taxes.

We think it plainly established that the disputed road had been regularly used by certain of the appellees and their predecessors from at least 1913 on, and that it had been used by all of the appellees and their predecessors for well over twenty years before the filing of suit. They and their agents regularly used it to visit their lands and to haul firewood and timber from them, and they and their employees, friends and members of the public used it for various purposes, such as to transport boats to Eagle Pond, to visit Eagle Pond for

recreational purposes and to hunt in the woods. When the Watsons lived on their parcel, the road was used several times daily by the iceman and often by the postman; individuals for whom various members of the Watson family worked used it every day in calling for them and returning them home. Those who used the road did so on foot, in wagons and carts and motor vehicles of various sorts. The Watsons repaired the road from time to time and so did others of the appellees, more casually.

Leekley argues that the use of the road was permissive and not hostile, relying on statements in *Wilson v. Waters,* 192 Md. 221, and *Feldstein v. Segall,* 198 Md. 285, (not necessary to the decision of either case) that no presumption that the use was adverse arises when the way is over wild or unoccupied land. This has been said to be because it was the custom of neighbors to travel over such land for pleasure or convenience and the owners usually made no objection to their doing so, or because the use in wild, unoccupied territory would not be apt to be brought to the actual notice of the owner so that he could object. Some courts have held that the scope of this doctrine does not extend to unenclosed woodland forming part of a plantation or to a road passing near a barn or a residence. See annotation in 46 *A. L. R.* 2d 1140, for a discussion of the various views and holdings. Regardless of whether the search for the character of the use starts with a presumption that it was adverse, the answer ultimately must be found from the strength of the proof in the particular case.

The road here involved ran from a main public road and was clearly and manifestly a regularly traveled way that ran for much of the time to a clearing on which stood an inhabited dwelling which was visible from the main road. There was a mail box at the juncture with the main road which was almost opposite what is now Leekley's dwelling on the opposite of the main road. Hardly can it be said that it would fall in the classification of a way over wild or unoccupied territory. Regardless, however, of the presumptions that may or may not be applicable, we think the record shows as a fact, affirmatively and clearly, that the use was not per-

missive but as of right. Witness after witness said that the thought of asking permission from anyone never occurred to them, that they did not think it necessary, that they had a right of way over the road and that there was no one who could say them nay. There was testimony that all of Leekley's predecessors in title actually knew of the regular and relatively extensive use of the road by all who had occasion to use it, as well as of the fact of its repair from time to time by various users. There was testimony that Brown, an early predecessor in title of Leekley, would have, in the opinion of the witness who knew him well, forbidden use of the road had he thought he had a right to do so. It was shown that Kenworthy, who succeeded Brown in title and held it between 1937 and 1949, had his farmer, Bedford, block other woodland roads every year to prevent their use by gatherers of holly, but that he told Bedford never to close the road in question "because, as far as he knew, it was a public road."

Not only did the users of the road and the owners of the land over which the road ran agree that the public had a right to use the road and were not using it by permission, but the terms used by the witnesses in referring to the road are significant in reflecting the idea that it was generally regarded as a public way. The witnesses variously said that it was "a public thoroughfare", "the main road", a "well-used road", "our permanent way", and "the main drag".

We think the record shows that the use of the road was notorious and adverse and that it was continuous for the requisite length of time.

*Decree affirmed, with costs.*