833 A.2d 536

**Harold M. MILLER, Jr., et ux.**

**v.**

**Roger M. KIRKPATRICK, et al.**

**No. 2, Sept. Term, 2003.**

Court of Appeals of Maryland.

Oct. 9, 2003.

336

338

Michael J. Jacobs (Melanie J. Barney, Easton, on brief), for petitioners.

Jack L. B. Gohn, Baltimore, Alvi C. Monshower, Jr., Richard L. Miller, Columbia, Amicus Curiae.

Lawrence G. Bohlen, Cambridge, for respondents.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

HARRELL, J.

On 31 October 2000, Harold Miller, Jr. and his wife, Bride ("the Millers"), Petitioners here, filed a complaint in the Circuit Court for Dorchester County against Respondents, Roger Kirkpatrick and his wife, Elsie ("the Kirkpatricks"). The complaint was in response to the Kirkpatricks' installation of two parallel barbed wire fences ("the fences") along an access road within a right-of-way easement created by deed and benefitting the Millers. Among various claims in the complaint, the Millers sought a declaration to quiet title, damages based on trespass, and an order requiring removal of the fences from the right-of-way.

A three-day trial was held in the spring of 2001. The equitable claims were tried to the court while a jury concurrently considered the damages claim. At the conclusion of all the evidence, the trial judge found, as a matter of law, that the Millers possessed an express grant of a right-of-way easement, twenty feet in width, accomplished by a reservation in a deed, across the Kirkpatricks' property. The jury then found

that the Kirkpatricks were not liable to the Millers for interference with use of the easement or failure to contribute to the maintenance of the roadway within the right-of-way, and declined to award compensatory damages. Following the jury verdict, the trial judge refused to order removal of the fences from the right-of-way. Subsequently, he also denied various post-trial motions filed by the Millers, including a motion for new trial in which the judge's recusal was sought based on alleged acts of bias against the Millers and their attorneys during the trial.

On direct appeal by the Millers, the Court of Special Appeals, in an unreported opinion, affirmed the judgment. We granted Petitioners' petition for writ of certiorari, *Miller v. Kirkpatrick*, 374 Md. 82, 821 A.2d 370 (2003), to consider two questions:

1. Where the Trial Court has declared that a right-of-way is 20 feet in width, was it error for the Trial Court to refuse to grant injunctive relief for the removal of two parallel barbed wire spite fences constructed within the right-of-way, on the basis that the jury refused to award monetary damages for past interference?

2. Does the requirement of this Court in *Surratt v. Prince George's County*, 320 Md. 439, 578 A.2d 745 (1990), that under appropriate circumstances, a different judge should hear the evidence on allegations of judicial misconduct, apply to a hearing on post-trial motions where court personnel are prepared to testify about the one-sided misconduct of the Trial Judge before the jury, and that Trial Judge himself puts on the record, his strongly-felt previously undisclosed bias arising from unrelated cases up to three years earlier, against counsel for the dominant tenement, as an apparent explanation for his conduct?

## I.

### A. Factual Background

We quote from the unreported opinion of the Court of Special Appeals:

"On or about December 9, 1957, Thomas M. Galbreath Jr. and his wife, Ethel, obtained a survey of their property, known as Travers Farm, in order to subdivide it into two distinct parcels. The survey also platted a twenty-foot wide right-of-way as the means of unrestricted access to and from the smaller parcel of property and the public road. The right-of-way is located on the larger parcel, now owned by members of the Kirkpatrick family, and is contiguous to the northern boundary of the smaller property. [Petitioners] own the smaller of the two parcels (the 'Miller property'), which includes the original residential farmhouse and tillable lands.

"By deed dated February 7, 1958, the Galbreaths conveyed the smaller of the two parcels, including the farmhouse, to Stanton H. Davis and his wife, Ruth Noe Davis. On February 23, 1966, the elder Kirkpatricks acquired the larger parcel. The deed stated that the conveyance was subject to the right-of-way granted to Mr. and Mrs. Davis. Then, by deed dated October 27, 1977, Mr. and Mrs. Davis conveyed their parcel to [Petitioners]. The deed included an easement for the right-of-way. At the time of the conveyance, the 1957 survey was recorded in the land records. It is undisputed that there were no fences in the right-of-way when it was created.

"Mr. Kirkpatrick initially farmed the Miller property and also maintained the right-of-way. In 1984, however, when the Millers hired another person to farm their land, their relationship with Mr. Kirkpatrick deteriorated substantially. As a result, Mr. Miller assumed primary responsibility for maintenance of the right-of-way, and [Petitioners] claimed that Mr. Kirkpatrick interfered with that effort. According to [Petitioners], Mr. Kirkpatrick repeatedly put obstacles on the road that damaged their equipment and threatened the Millers with physical harm. For example, on one occasion, Mr. Kirkpatrick approached Mr. Miller while holding a rifle, poked Mr. Miller with it in the chest, and threatened bodily harm if Mr. Miller continued to maintain the entire right-of-

way. That incident was the subject of a criminal prosecution."

In July 2000, Mr. Kirkpatrick erected two parallel barbed wire fences, inside the drainage ditches, along each side of the access road, approximately twelve feet apart. The fences foreclosed the Millers' ability to use or maintain forty percent of the right-of-way and prevented access directly from the right-of-way to the Millers' farm fields. Mr. Kirkpatrick testified that he erected the fences "to protect [his] property" because he "did not want Mr. Miller to steal it." Respondents' daughter, Deborah Kirkpatrick Harrison, when asked: "What function does the fence serve as you understand it?," replied "I think nothing says keep out more than a barb wire fence."

### B. Procedural History In the Trial Court

As noted above, the Millers filed a complaint in the Circuit Court for Dorchester County on 31 October 2000. Their flagship claims sought a declaration to quiet title, removal of the fences, and damages based on trespass.

At the conclusion of the evidence at the three day trial, the trial judge found preliminarily, as a matter of law, that the right-of-way existed and was twenty feet wide. The judge then submitted the following pertinent questions to the jury on the verdict sheet:

1. Do you find that the Defendants, or any of them, are liable to the Plaintiffs for intrusion upon their seclusion?

——— ———

Yes No

If your answer is "no", go to question 2.

\* \* \*

2. Do you find that the Defendants or any of them, are liable to the Plaintiffs for interference with and/or for failure to contribute to the maintenance of the common roadway?

——— ———

Yes No

The jury answered "no" to both questions. Accordingly, the jury did not award any compensatory damages to the Millers.

After the jury returned its verdict, the trial judge continued his oral ruling as to the remaining equitable claims, stating in pertinent part:

"Now, I look at the request here. The plaintiff has requested that the fence be prohibited from trespassing on the Miller property. Well, there's no evidence that they had been trespassing on the Miller property. The controversy here is over the right-of-way which is not Miller property. It is Kirkpatrick property which the Millers have the right to use. Request for interfering in any way with the use of maintenance [sic] of the roadway by plaintiffs and their family, friends and business invitees I deny that request because there's no showing that in fact there was such interference.

"There's a request that the barbed wire be removed. I deny that request. So far as I know the owner of property in fee simple has the right to use that property in any way he sees fit, that's not contrary to law, [or] the rights of somebody else.

"Now, an easement does not necessarily mean that the person may not use the—the owner of the underlying fee may not use the property in any way. . . .

\* \* \*

"Now, I deny the request to prohibit the defendants from threatening or seeking to intimidate the plaintiff or family, friends, or business invitees from using or maintaining the roadway, including without limitation—well, firearms. The jury has found in this matter that there has been no interference with the right of user of the roadway. Some of these requests are duplicates. . . ."

The Millers' counsel remonstrated that the jury only had been asked to consider damages for interference, not whether any interference had occurred. The ensuing colloquy between Petitioners' counsel and the trial judge is noteworthy:

"[PETITIONERS' COUNSEL]: [T]he court has declared, as the Millers have contended right along, that there is a twenty foot right-of-way. There was substantial evidence that the fence interfered with the maintenance and use of that right-of-way.

"THE COURT: I found by a preponderance of the evidence that it did not.

"[PETITIONERS' COUNSEL]: I'd like to be heard on the whole thing because I want a complete record on this.

"[THE COURT]: All right, sir. Make your record.

"[PETITIONERS' COUNSEL]: But, basically the determination that the fence does not interfere where there is such substantial evidence really guts the declaration of the court of any meaning and effect. The fence is—you know, if the fence were at the edge of the twenty foot boundary, no problem.

"[THE COURT]: They've got a right to put a fence on there anywhere they want to as long as they don't interfere with the use of the easement.

"[PETITIONERS' COUNSEL]: But you've had substantial evidence that they did interfere with the easement.

"[THE COURT]: And there was evidence that they did not.

"[PETITIONERS' COUNSEL]: What, Mr. Jackson [a farmer who worked the Kirkpatricks' fields] might be able to get his tractor down—

"[THE COURT]: Well, he said it was a very close fit but he could get through there. And I find by a preponderance of the evidence that there's no interference. Now let's get on.

"[PETITIONERS' COUNSEL]: Well, I understand what your—what your finding is, but I'd like this record to be clear because I think that is an egregious error in this case not to deal with the fence and to require [it] to be removed ... outside of the twenty foot boundary. Now, the whole— all of the evidence was that the reason that this suit was filed was that fence was such a material factor. The notion that Mr. Jackson might be able to get his combine down—

"[THE COURT]: More than might.

\* \* \*

"[PETITIONERS' COUNSEL]: Well, it was definitely might because he hadn't done it and he said that. I said your combine is twelve feet across. We know that the fence post[s] certainly come at least as close as twelve feet across. Jackson has never been down there so that is pure speculation.

"What is not speculation is the fact that the ability to maintain those ditches within the twenty feet so as to avoid the build up of brush, so as to permit a free flow of drainage and to permit the avoiding [of] problems with the drifting of snow, that evidence is unrebutted. The notion that you can go along with a scythe and get most of it misses the boat. It really makes the declaration meaningless in terms of this case.

\* \* \*

"And so without the—the whole concept—and really it's contradictory really of the court's own findings that the plaintiffs have a right to use and maintain the right-of-way free from unreasonable interference. What the testimony is, is that they haven't been able to use and maintain it free from interference once that fence went up . . . .

\* \* \*

"The point is this. I would urge the court to reconsider that issue with the fence, to require it to be removed to the twenty foot—I mean what is the point of the fence? There's no livestock. The only point of the fence—

"THE COURT: It doesn't have to have a point. He's got a right to put it. As long as he doesn't interfere he's got an absolute right as the owner of the fee simple."

By written order, dated 13 June 2001, the Circuit Court memorialized that the parties' predecessors in title created an express easement, by reservation in a deed, across the land owned by the Kirkpatricks, for the benefit of the land owned by the Millers, "for the passage and repassage of persons and

vehicles over the roadway...." The Circuit Court further found that the express easement had a width of twenty feet, and that Petitioners and their invitees were "entitled to pass over and across said roadway without interference from the [Respondents]." In addition, the Circuit Court held the "respective property owners ... equally responsible for the maintenance of ... [the] roadway." Finally, the Circuit Court concluded that "the jury having found no interference with the use of the right-of-way, all requests for the injunction are denied."

The Millers submitted several post-trial motions, including a motion, filed on 13 June 2001, for a new trial based on their perception of the trial judge's biased behavior against them and their attorneys in front of the jury. On the same day, the Millers moved to alter or amend the judgment. On 15 June 2001, they asked that another judge hear the motion for a new trial and, on 27 June 2001, they filed a motion to have the court visit and view the right-of-way in issue. The judge who presided at trial heard argument and denied all motions on 3 August 2001.

### C. Procedural History on Appeal

In the Court of Special Appeals, Petitioners argued that the Circuit Court erred in permitting the Kirkpatricks "to continue to maintain, within that declared right-of-way, the relatively recently erected parallel barbed wire fences 12–feet apart which effectively limit the [Petitioners'] right-of-way to a 12 foot width." Petitioners also maintained that the trial court erred when it refused "to have another judge consider the motion for a new trial as to the jury's determinations on damages premised on the personal misconduct of the Trial Judge" and when it refused "to grant the motion for new trial on the jury's determinations on damages based on the material personal prejudicial misconduct of the Trial Judge in the presence of the jury."

The Court of Special Appeals, in an unreported opinion filed on 8 November 2002, affirmed the Circuit Court's judgments. On the issue of the fences in the right-of-way, the intermediate

appellate court held that the Kirkpatricks, as owners of the fee, are entitled to use the access road also, so long as they do not unreasonably interfere with the Millers' use. The court found there was no interference with the right-of-way because the jury's determination not to award damages meant that it also found there was no interference that deprived the Millers of their use of the road. On the claims of judicial misconduct during the trial as asserted in the new trial motion, the court found no basis in the record to support Petitioners' post-trial assertion that they were treated unfairly by the trial judge. In addition, the court found that the allegations did not require another trial judge to decide the recusal request.

## II.

### A. Summary of Our Conclusions

■ We disagree with the Court of Special Appeals regarding the fences and the use of the right-of-way, but concur with its disposition of Petitioners' motion for recusal of the trial judge. As regards the right-of way, given the absence in the Kirkpatrick's deed of a reservation in them to modify the express easement prospectively, the Court of Special Appeals and the Circuit Court should not have concerned themselves with whether the Kirkpatricks' alteration of the express easement, by installation of the fences, afforded the Millers reasonable access to their home and farm property. That is the wrong question to be analyzed. We hold rather, as a matter of law, that the Kirkpatricks, standing in chain of title as grantors of an express easement, may not unilaterally narrow the right-of-way easement from twenty feet to twelve feet by the installation of the fences. As regards Petitioners' motion for recusal of the trial judge, Petitioners waited until after an unfavorable jury verdict to file a motion for new trial and recusal reciting perceived wrongs or slights alleged to have occurred throughout or even prior to the trial, without proper preservation. Under the circumstances present in this case, we hold that the motion for recusal was, at a minimum, untimely.

### B. The Fences

As a prelude to considering this issue, it is useful to revisit some well-settled principles of real property law and particularly those governing easements. "An easement is broadly defined as a nonpossessory interest in the real property of another, and arises through express grant or implication." *Boucher v. Boyer*, 301 Md. 679, 688, 484 A.2d 630, 635 (1984) (citations omitted). In general, the terms "easement" and "right-of-way" are regarded as synonymous. *Chevy Chase Land Co. v. United States*, 355 Md. 110, 126, 733 A.2d 1055, 1063 (1999).

An express easement by reservation arises when a property owner conveys part of his property to another, but includes language in the conveyance reserving the right to use some part of the transferred land as a right-of-way. *Knotts v. Summit Park Co.*, 146 Md. 234, 239, 126 A. 280, 281–82 (1924). "In every instance of a private easement—that is, an easement not enjoyed by the public—there exists the characteristic feature of two distinct tenements—one dominant and the other servient." *Bd. of County Comm'rs of Garrett County v. Bell Atlantic–Md., Inc.*, 346 Md. 160, 175, 695 A.2d 171, 179 (1997). "Where a right of way is established by reservation, the land remains the property of the owner of the servient estate, and he is entitled to use it for any purpose that does not interfere with the easement." *Greenwalt v. McCardell*, 178 Md. 132, 136, 12 A.2d 522, 524 (1940) (citation omitted). The generally accepted rule for an express easement is "that [because] an easement is a restriction upon the rights of the servient property owner, no alteration can be made by the owner of the dominant estate which would increase such restriction except by mutual consent of both parties." *Reid v. Washington Gas Light Co.*, 232 Md. 545, 548–49, 194 A.2d 636, 638 (1963) (citation omitted).

Our cases establish that the Millers' right-of-way entitles them to traverse it and that the Kirkpatricks, as owners of the fee, are also entitled to use the property.

The owner of the dominant tenement is entitled to use the easement only in such manner as is fairly contemplated by his grant, whether expressly or implied, and the owner of the servient tenement is entitled to use and enjoy his property to the fullest extent consistent with the reasonably necessary use thereof by his neighbor in accordance with the terms and conditions of the grant.

*Millson v. Laughlin,* 217 Md. 576, 585, 142 A.2d 810, 814 (1958).

The subservient tenement may not obstruct the use of the easement. We said in *Maddran v. Mullendore,* 206 Md. 291, 297, 111 A.2d 608, 610 (1955), that "it is axiomatic that the owner of a servient tenement cannot close or obstruct the easement against those who are entitled to its use in such manner as to prevent or interfere with their reasonable enjoyment." *See also Klein v. Dove,* 205 Md. 285, 107 A.2d 82 (1954) (affirming decision of trial judge to grant an injunction requiring the defendants to remove obstructions from the right-of-way and restraining them from interfering with the plaintiff's right-of-way)

Respondents' brief in this Court adopted the Court of Special Appeals's unreported opinion as their argument. The Court of Special Appeals held that the Kirkpatricks, as owners of the fee, are entitled to use the road, so long as they do not unreasonably interfere with the Millers' use. The court reasoned that there was no interference with the right-of-way by erection of the fences because the jury's determination not to award damages for interference meant there was no interference that deprived the Millers of their use of the road.

We conclude that, although the Kirkpatricks also may use the access road as such, they may not unilaterally modify or reduce the right-of-way in a manner or extent that is inconsistent with the intention of the parties as gleaned from the language of the deed granting the right-of-way. *Chevy Chase Land Co.,* 355 Md. at 123, 733 A.2d at 1062.

In construing the language of a deed, the basic principles of contract interpretation apply. The grant of an easement by deed is strictly construed. *Buckler v. Davis Sand and Gravel Corp.*, 221 Md. 532, 538, 158 A.2d 319, 323 (1960). The extent of an easement created by an express grant depends upon a proper construction of the conveyance by which the easement was created. *Id.* "The primary rule for the construction of contracts generally—and the rule is applicable to the construction of a grant of an easement—is that a court should ascertain and give effect to the intention of the parties at the time the contract was made, if that be possible." *Id.*

Here the subject deed(s) and referenced survey— as determined by the Circuit Court—granted the dominant tenement a right-of-way for ingress and egress that was twenty feet in width. The grant of the right-of-way to the Millers—as set forth in the deed, dated 27 October 1977—does not contain any reservation of rights to the grantors. Similarly, there is no written instrument of record reserving to the owners of the servient tenement the power to modify the contractually fixed grant of the express easement. As we said as long ago as 1880, the grant of an express easement is founded upon the maxim that "a grantor shall not *derogate* from his grant."[1] *Mitchell v. Seipel*, 53 Md. 251 (1880)(emphasis in original). This principle is deeply embedded in the common law, and "if the grantor intends to reserve any right over the tenement granted it is his duty to reserve it expressly

---

1. Black's Law Dictionary defines the term "derogate," as used in this context, as the "detraction, prejudice, or destruction (of a grant or right)." Blacks Law Dictionary 455 (7th ed.1999). *See, e.g., Tong v. Feldman*, 152 Md. 398, 402, 136 A. 822, 823 (1927)("ordinarily it is to be presumed that the grantor has made all the reservations he intended, when making his grant, and he is not permitted to contradict or derogate from his grant"); *Dalton v. Real Estate and Improvement Co.*, 201 Md. 34, 47, 92 A.2d 585, 591 (1952) ("if a grantor intends to reserve any rights or uses in or over the tenement granted, he must reserve them expressly ... the reason for [this] rule is said to be that a grantor cannot derogate from his grant").

in the grant, and to this the only exception is of ways or easements of necessity." *Id.*

The cases of *Bump v. Sanner,* 37 Md. 621 (1873) and *Brooks v. Voigt,* 224 Md. 47, 166 A.2d 737 (1961) are pertinent examples of grantors being prevented from derogating from their grants. In *Bump,* the plaintiffs had an express easement in an alley designated on a filed plat and, thus, had by grant the right to use the alley. There, as here, the defendant had chosen to deny the plaintiffs the use of a portion of the express easement. We said that a grant of a right to use a piece of property includes " 'the last inch as well as the first inch,' and therefore it is clear that the fence or obstruction placed upon it by defendant is an invasion of the plaintiff's legal rights, for which an action may be maintained." *Bump,* 37 Md. at 627–28. The defendant in *Bump* had grown tired of the waste water and offal that found its way down the alley to his house, and he supposed that he had the right to place across the alley an obstruction to prevent this nuisance. We pointed out that this injury "cannot give him the right to close the alley; and deprive the plaintiffs of the use of it or any part of it." *Id.* We acknowledged that "the question of damages is of course exclusively for the jury." *Id.* Thus, implicitly an unlawful obstruction of the right-of-way could be found without necessarily being joined with the award of monetary damages merely on the basis that an obstruction was found to be inconsistent with the grant.

In *Brooks* the Court also was dealing with an alley over which the plaintiffs had an express easement. The fee simple owner of the alley denied the easement holders the use of parts of the alley arguing that the plaintiffs only needed enough of the alley that was needed to give them access from the rear of their property to the public street. We held that the express easement was coextensive with the entire length of the alley and the express grant of the right to the use of an alley carried the right to use the whole of the alley. 224 Md. at 50, 166 A.2d at 739. The grant of the easement in the original conveyance could not be narrowed unilaterally by the

servient tenement and, thus, the dominant tenement was entitled to the use of the whole of the fifteen foot alley. *Id.*

In the present case, the Court of Special Appeals reiterated in its opinion our explanation in *Bishields v. Campbell,* 200 Md. 622, 624, 91 A.2d 922, 923 (1952), involving a prescriptive easement, that "a right of way is merely a right of passage and the owner of the land is entitled to use it for any purpose that does not unreasonably interfere with the use of the easement." The intermediate appellate court then found that the jury's determination that no damages should be awarded meant there was no unreasonable interference with the express easement. We do not agree that the jury's decision as to damages was determinative of the proper declaration and enforcement of the foundational property rights found by the court to exist in this case.

The respective roles of the trial judge and jury in the application of Maryland easement jurisprudence was discussed by this Court in *Greenbaum v. Harrison,* 132 Md. 34, 35, 103 A. 84, 85 (1918), and *Leekley v. Dewing,* 217 Md. 54, 58, 141 A.2d 696, 697–98 (1958). In *Greenbaum* and *Leekley,* the questions for the jury were limited to: (1) determining whether an easement existed; and (2) determining the amount of monetary damages the defendant may be liable for as a result of the defendant's interference with a plaintiff's enjoyment of an easement. In *Greenbaum,* we indicated that the existence of a disputed easement could be a question of fact to be resolved by the jury as the finder of fact:

> We will first consider the objection of the defendants to the bill upon the question of jurisdiction, and that is, whether the proceedings in this case involves a real, disputed question of title to the easement in question, because if that be true it is too clear for argument that a court of equity would be without jurisdiction to determine it and could not grant the relief sought by the bill until the title had been established at law.

132 Md. at 34, 103 A. at 85. We said in *Leekley,* however, that "where there is no reasonable doubt as to the title or the

propriety of equitable action is evident, an equity court may act in cases involving title and enjoin continuing trespasses or declare rights as to ways." 217 Md. at 58, 141 A.2d at 697–98.

In the present case, there was no dispute of fact to be resolved by the jury regarding the existence of the express grant of the right-of-way. The Circuit Court properly concluded, as a matter of law, that the width of the Millers' right-of-way was twenty feet. Similarly, there was no dispute of fact that the Kirkpatricks' fences were erected within the right-of-way and impeded access to approximately forty percent of the right-of-way. The Circuit Court refused to order the removal of the fences on the basis of: (1) the Circuit Court's own conclusion that the fences did not interfere unreasonably with the Millers' use of the right-of-way; and (2) the jury's finding of no liability for damages for the Kirkpatricks' interference with the Millers' use of the right-of-way.

The trial judge's conclusion of no unreasonable interference with the express easement was premised on an incorrect legal analysis. He should not have considered the reasonableness of the established interference and physical obstruction. Rather, any interference of a permanent nature within a right-of-way that obstructs an express easement, created by reservation, for ingress and egress is unlawful as a matter of law and should be ordered removed. *Bump v. Sanner*, 37 Md. 621, 627–28 (1873) (the grant of a right to use a piece of property includes "the last inch as well as the first inch" and a fence or obstruction placed upon it by the servient tenement is an invasion of the dominant tenement's rights); *Brooks*, 224 Md. 47, 166 A.2d 737 (1961) (the grant of the fifteen foot easement in the original conveyance can not be narrowed unilaterally by the servient tenement).

The verdict sheet in the trial essentially tasked the jury with determining liability, if any, for monetary damages. The use of the term liability on the verdict sheet meant the jury was to consider only whether to make an award of monetary damages. Blacks Law Dictionary defines the terms "liability,"

"civil liability," and "liable" in terms of an obligation to pay monetary damages:

> **liability,** *n.* 1. The quality or state of being legally obligated or accountable; legal responsibility to another or to society, enforceable by civil remedy or criminal punishment <liability for injuries caused by negligence>.—Also termed *legal liability.* 2. (*often pl.*)

BLACKS LAW DICTIONARY 925 (7th ed.1999).

> **civil liability.** 1. Liability imposed under the civil, as opposed to the criminal law. 2. The state of being legally obligated for civil damages.

*Id.* at 926.

> **liable,** adj. 1. Responsible or answerable in law; legally obligated. 2. (Of a person) subject to or likely to incur (a fine, penalty, etc.)—Also termed *legally liable.*

*Id.* at 927.

This Court in *Megonnell v. United States Automobile Assn.,* 368 Md. 633, 796 A.2d 758 (2002), examined the term "legally liable" as used in an insurance policy. We explained that the nature of the legal process itself means that

> the term "legally liable" to pay damages depends not upon when, and if, a judicial determination is made, but, generally, upon the creation of circumstances by and/or between parties, whereby the parties, or one or other of them, can enforce rights through legal process. Parties often become legally obligated ("liable") to pay by way of contract, i.e., construction contracts, leases, insurance contracts, etc., or by committing tortious acts. The verdict of a jury and the judgment of a court are merely a determination that a legal obligation existed, and continues to exist.

368 Md. at 645, 796 A.2d at 765–66. Our elucidation of the term "legally liable" in *Megonnell* is consistent with the definitions for "liable" and "liability" found in Black's Law Dictionary. As such, use of the term "liable" on the verdict sheet in the present case asked the jury to consider whether to make an award of monetary damages, but not whether the fences should be removed. With respect to the jury's finding

of no liability for damages, the jury correctly was not requested to and it did not make any findings regarding the scope of the express easement or removal of the fences. The jury's finding of no monetary liability had no bearing on the trial judge's obligation to order removal of the fences in the right-of-way.

In *Simon Distributing Corp. v. Bay Ridge Civic Ass'n, Inc.,* 207 Md. 472, 114 A.2d 829 (1955), we affirmed a circuit court's decree ordering a chain suspended between posts—restricting access to the right-of-way—be removed because the chain was a physical obstruction. The offending chain had been placed in position by the servient tenement. We concluded that the grantor

> retained title to the bed of the roads or paths over which rights of way were granted by sales made on the basis of the plats. The grantor-developer obviously had no use for the property otherwise than as roads or paths, and hence had no apparent purpose to serve by putting up gates or chains at any point. The main purposes of the rights-of-way in this waterfront were evidently to enable lot owners and their families to get about in the development and to get to the water. Gates, chains or like obstructions across any roads or paths could only defeat this purpose or make its attainment more difficult. The fair inference from the showing of these ways on the plats was, we think, that they should be unobstructed. . . .

207 Md. at 480–81, 114 A.2d at 833.

When an easement has been located by mutual agreement of the parties and granted by deed, the express easement cannot thereafter be obstructed physically by one party acting unilaterally. *Waldschmidt v. Vito,* 228 Md. 328, 330, 179 A.2d 884, 885 (1962) (ordering removal of a fence barring access to an express easement by grant that gave waterfront owners the rights of ingress and egress across the right-of-way to the water). Just as we have found fences and gates restricting access to rights-of-way to be impermissible obstructions, so also we conclude that a permanent physical

obstruction placed in an express easement created by grant—in the absence of an agreement or surrounding circumstances to the contrary—interferes as a matter of law with the dominant tenement's right to the use of all the express easement. It is axiomatic that an express easement for ingress and egress includes the right to unfettered physical access up to the boundaries of the easement.

### III.

#### A. The Motion for Recusal of the Trial Judge

After the jury rendered its unfavorable verdict against Petitioners, Petitioners, in a new trial motion, asserted that they were prejudiced by the behavior of the trial judge towards their counsel in front of the jury and that a new trial was required based on that judicial misconduct. In addition, Petitioners believed that the trial judge's alleged "personal misconduct" meant that their post-trial motion should be heard by a different judge.

Petitioners' recusal motion stated, in pertinent part:

"The Plaintiffs ... here supplement their Motion for a New Trial to state that in light of the fact that the basis for that Motion is the behavior of the Trial Judge, the decision in *Surratt v. Prince George's County,* 320 Md. 439, 578 A.2d 745 (1990), and the Trial Judge's angry denial that it was or ever could be unfair or partial in this case or in any other case, the Motion For a New Trial should be heard by a different judge. *See also, Jefferson–El v. State,* 330 Md. 99, 622 A.2d 737 (1993).

"At that hearing, the Plaintiffs intend to call witnesses such as court personnel, to establish the significant pattern of one-sided misbehavior by the Trial Judge in this case is and has been, a long-standing problem with this particular Trial Judge, and that improper conduct in front of the jury in the instant case was egregious and prejudicial to the Plaintiffs."

On appeal, the Court of Special Appeals concluded that:

> We have combed the record and are satisfied that there was no disparate treatment of the parties or their lawyers, nor was there conduct amounting to judicial misconduct. Indeed, we find no basis in the record to support appellants' after-the-fact assertion that they were treated unfairly by the judge. To the contrary, appellants prevailed on the key issue in the case, concerning the existence of an easement having a width of twenty feet; it was the court that resolved that issue, in appellants' favor, as a matter of law. Moreover, the allegations here do not require another judge to decide the recusal motion. Therefore, we are amply satisfied that the court below did not err or abuse its discretion in regard to the recusal motion.

We agree with the Court of Special Appeals on this point.

We stated in *Surratt v. Prince George's County*, 320 Md. 439, 468, 578 A.2d 745, 759 (1990), that a party must file a timely motion in order to initiate the recusal procedure. A timely motion ordinarily is not one that represents "the possible withholding of a recusal motion as a weapon to use only in the event of some unfavorable ruling." 320 Md. at 468–69, 578 A.2d at 759. Consequently, the motion generally should be filed "as soon as the basis for it becomes known and relevant." 320 Md. at 469, 578 A.2d at 759.

In *Surratt*, the trial judge denied a recusal motion filed by a female attorney who alleged that the judge had engaged in sexual harassment of her over a period of years. 320 Md. at 463, 578 A.2d at 757. The recusal motion was filed after a remittitur was granted against the female attorney's clients. 320 Md. at 469, 578 A.2d at 760. We said in *Surratt* that counsel could have made the recusal motion before the remittitur, but we identified various reasons why it was acceptable, under the special circumstances of that case, to file the recusal motion after the remittitur:

> To make the motion in the midst of trial would have or could have caused disruption and delay. To make the motion

before the judge ruled on the remittitur request might have prejudiced the clients and produced an even more drastic remittitur, or perhaps an adverse judgment n.o.v. The lawyer also was reluctant to make the motion until she could point to some indication of prejudice.

*Id.*

The trial judge's grant of the remittitur in *Surratt* was part of the prejudicial conduct alleged by the female attorney and was part of the proof of her disparate treatment. In the present case there was no proof tendered that the jury's return of the verdict was influenced by the alleged prejudicial conduct. Rather it appears that the only reason Petitioners waited until after the jury verdict to file the motion for recusal was to see what the jury would decide on the issues submitted to it. At the point in time the jury was asked to deliberate, the Petitioners had prevailed, with the trial judge, on the key issue concerning the existence of an express easement having a width of twenty feet.

The trial judge's generally asserted misconduct occurred during the trial, before the jury began deliberations, and, to some degree, even before trial began. As to the latter claim, it appears that Petitioners' counsel were of the view that the alleged conduct toward them at trial was merely the most recent of a "significant pattern of one-sided behavior [against Petitioners' counsel] by the Trial Judge ... and has been a long-standing problem...." If that were so, Petitioners should have filed a motion requesting a mistrial or recusal before the jury rendered its verdict, or perhaps sought the judge's recusal before trial.

With regard to recusable conduct occurring at trial, the Court of Special Appeals in *Braxton v. Faber*, 91 Md.App. 391, 604 A.2d 543 (1992), held that a party wishing to make a proper record of perceptually prejudicial conduct by a judge during trial, and especially conduct not inherently capable of being captured through the medium of a printed transcript, nonetheless must create a record in which

(1) facts are set forth in reasonable detail sufficient to show the purported bias of the trial judge; (2) the facts in

support of the claim must be made in presence of opposing counsel and the judge who is the subject of the charges; (3) counsel must not be ambivalent in setting forth his or her position regarding the charges; and (4) the relief sought must be stated with particularity and clarity. 91 Md.App. at 408–09, 604 A.2d at 552.

As the intermediate appellate court stated, "in requiring counsel to register charges of bias thusly, we seek to prevent conclusory allegations of bias from being sufficient to upset an unfavorable verdict and, at the same time, obviating the necessity for holding a mini-trial on the truth of the allegations." 91 Md.App. at 409, 604 A.2d at 552. A motion for recusal—under the alleged circumstances in this case—is not timely, after an unfavorable jury verdict, to review alleged wrongs that might have been remedied at or before trial. *See, e.g., United States v. Yonkers Bd. of Educ.*, 946 F.2d 180, 183 (2d Cir.1991)(a motion to disqualify must be made at the earliest possible moment because "the timeliness requirement is necessary to prevent waste of judicial resources," and it ensures that the movant does not "hedge its bets against the eventual outcome") (citations omitted).

 Petitioners suggest that the trial judge's "tone of voice and demeanor" were "notably inappropriate and one-sided" during the trial and that such may have led the jury to return the verdict it did.[2] Petitioners, however, never requested a mistrial when this alleged conduct occurred, but waited until after an unfavorable jury verdict was returned.

---

2. In their brief in this Court, Petitioners direct our attention to only one reference in the Record Extract where they contend a contemporaneous effort was made to object during the trial to the alleged one-sidedness of the trial judge's tone of voice, demeanor, or resultant rulings. That reference, occurring on the second day of trial, 1 June 2001, was as follows:

> "[MILLERS' COUNSEL][in direct examination of the Millers' expert surveyor witness]: Were you able to locate field markings which— consistent with the '57 survey told you where that twenty foot private road was?
> "[KIRKPATRICKS' COUNSEL]: Again, objection, you honor.

It is not a permissible tactic for Petitioners to wait until after an unfavorable jury verdict before filing a motion for recusal under these circumstances. 320 Md. at 469, 578 A.2d at 759. Petitioners essentially did not complain about the trial judge's conduct until after the unfavorable jury verdict that followed a three-day trial. Under the particular circumstances of this case, the recusal motion was untimely.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTION TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR DORCHESTER COUNTY, AND TO REMAND THIS CASE TO THE CIRCUIT COURT FOR ENTRY OF JUDGMENT CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE DIVIDED EQUALLY BY PETITIONERS AND RESPONDENTS.**

---

"THE COURT: I will object because there is no evidence before this court that there is a twenty foot roadway granted. Now, if you ask a question as to whether he can from the notes establish the width of the right-of-way that's a horse of another color. But at this point there is no evidence whatsoever. Let's be perfectly clear on that that there is a twenty foot roadway granted.

"[MILLERS' COUNSEL]: Your honor, I reserve my strong objection to that characterization before the jury, but let's proceed.

"THE COURT: The jury is not going to decide the issue I can assure you of that, sir.

"[MILLERS' COUNSEL]: Your honor, I don't want to get into a mistrial situation. That's what I'm concerned with.

"THE COURT: I don't think you're getting into a mistrial situation.

"[MILLERS' COUNSEL]: I think we're on the edge of it, sir.

"THE COURT: I don't think so. Proceed."

From this single exchange (and we are not inclined to search the record in aid of Petitioners' argument to see if more exist as that is not our proper role), we are unable to discern with clarity what the judge's tone of voice or demeanor was, or whether the evidentiary ruling was unduly "one-sided." If this one reference constitutes the trial record made in support of filing the recusal motion, it is perfectly understandable why the motion was denied and that denial affirmed by the Court of Special Appeals.