<u>Ottis E. Breeding, Jr., et al. v. Christian Nicholas Koste</u>, No. 66, September Term, 2014

**"WOODLANDS EXCEPTION" – ADVERSE POSSESSION –** Court of Appeals held that: (I) "woodlands exception" applies to adverse possession where land at issue is unimproved or otherwise in general state of nature; and (II) "woodlands exception" does not apply under this case's circumstances because land at issue is neither unimproved nor otherwise in general state of nature.

Circuit Court for Caroline County
Case No. 05-C-10-014160

Argued: April 7, 2015

IN THE COURT OF APPEALS

OF MARYLAND

No. 66

September Term, 2014

_____

OTTIS E. BREEDING, JR., ET AL.

v.

CHRISTIAN NICHOLAS KOSTE

_____

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

_____

Opinion by Watts, J.

_____

Filed: May 22, 2015

To establish a prescriptive easement,[1] a claimant must show adverse, exclusive, and uninterrupted use of another's real property for twenty years. See Banks v. Pusey, 393 Md. 688, 699, 904 A.2d 448, 454 (2006). Where an easement is claimed on land that is unimproved or otherwise in a general state of nature, there is a legal presumption that the claimant's use is by the owner's permission. See Clickner v. Magothy River Ass'n Inc., 424 Md. 253, 281, 35 A.3d 464, 482 (2012). This presumption, first referenced by this Court in 1865, has been termed the "woodlands exception," and, to date, has been applied only in cases involving easements. Id. at 281-82, 35 A.3d at 482 (citation omitted).

Here, we decide: (I) whether the "woodlands exception" applies to adverse possession; and, if so, (II) whether the "woodlands exception" applies under the circumstances of this case.

We hold that: (I) the "woodlands exception" applies to adverse possession where the land at issue is unimproved or otherwise in a general state of nature; and (II) the "woodlands exception" does not apply under this case's circumstances because the land at issue is neither unimproved nor otherwise in a general state of nature.

## BACKGROUND

Due to the claim's nature, a detailed recitation of the case's procedural and land transfer history is necessary.

---

[1]A prescriptive easement "is a nonpossessory interest in the real property of another . . . which arise[s] when a party makes an adverse, exclusive, and uninterrupted use of another's real property for twenty years." Banks v. Pusey, 393 Md. 688, 698, 904 A.2d 448, 454 (2006) (citations and internal quotation marks omitted).

On September 13, 2010, Christian Nicholas Koste ("Koste"), Respondent, filed in the Circuit Court for Caroline County ("the circuit court") a "Complaint for Title by Adverse Possession and Bill to Quiet Title" against adjoining landowners, Ottis Breeding, Jr., James "Rick" Breeding, and Terry Breeding (together, "the Breedings"), Petitioners, concerning the ownership of a piece of land known as the Landing on Watts Creek ("the Landing"). The Landing is a triangular parcel of land, more than 10,000 square feet in area, that abuts the southern side of a small body of water known as Watts Creek. The Landing is located between the northeast corner of Koste's property ("the Koste property") and the northwest corner of the Breedings' property ("the Breeding property"). The Koste property and the Breeding property are adjoining tracts of land that are bound to the north by Watts Creek. The Koste property is mostly wooded; and Koste resides in a home that overlooks the Landing. The Breeding property is used for surface mining.[2]

On October 22, 2010, the Breedings filed an answer to the complaint. On November 22, 2010, the Breedings filed a "Counter Complaint to Quiet Title and for Relief from Trespass," alleging that they held title to the Landing and that Koste's use of the Landing constituted trespass.[3]

Beginning on May 14, 2012, the circuit court conducted a five-day bench trial,

---

[2]Aerial photographs show that the Breeding property, like the Koste property, is mostly wooded.

[3]Koste used the Landing as a boat landing and mooring site, as a waterfowl hunting blind site, and as a general recreational and picnic area.

which included the circuit court's viewing the Landing.[4]  On November 19, 2012, the circuit court issued a Memorandum Opinion and Order, ruling that Koste had established a claim to the Landing by adverse possession.

As to the Koste property, the circuit court made the following findings of fact, which we summarize.  In December 1944, Koste's grandparents purchased the Koste property, which consisted of 125 acres of land, and moved into a home on the western end of the Koste property.  Shortly afterward, however, Koste's grandparents built a new home in the middle of the Koste property, close to Watts Creek.  By 1950, Koste's grandparents had moved into the new home.  In 1962, Koste's grandparents sold approximately thirteen acres of land, including the land that contained their old home.  From 1975 to 1985, from age five to fifteen, Koste lived with his grandparents at the Koste property.  From 1985 to 1988, Koste regularly visited his grandparents at the Koste property; and after graduating from high school in 1988, Koste continued to visit, though not as frequently.  In Koste's grandfather's last will and testament, executed in February 1989, Koste's grandfather provided for conveyance of his interest in approximately forty acres of the Koste property to Koste and another grandson.  In 1999, Koste's grandfather died.  In 2004, a portion of the Koste property was conveyed to Koste.  On October 15, 2004, Koste applied for a building permit to construct a home.  On October 14, 2008, Koste received an occupancy permit for his newly constructed home.

---

[4]Under Maryland Rule 2-515(a), "[t]he court, on motion of any party or on its own initiative, may order that the trier of fact view any property that is involved in the litigation or any place where a material fact in issue occurred."

As to the Breeding property, the circuit court made the following findings of fact, which we summarize. When Koste's grandparents purchased the Koste property in 1944, Beatrice Butler owned the Breeding property. In June 1946, Butler conveyed the Breeding property to Elizabeth MacDonald, who, several months later, conveyed the Breeding property to Leander and Madeline Jeffrey. In 1952, the Jeffreys conveyed the Breeding property to Madeline and Charles Birch. In 1953, the Birches conveyed the Breeding property to Chauncey and Marion Downes. In 1971, the Downeses conveyed the Breeding property to Mathias and Regina Mueller, who created a gravel pit on the Breeding property. On March 10, 1987, the Muellers conveyed the Breeding property to the Breedings and their father as joint tenants; the Breedings and their father continued the use of the Breeding property as a gravel pit. The Breedings' father died, and, by deed dated December 28, 2006, title to the Breeding property changed from the Breedings' holding the Breeding property as joint tenants to the Breedings' holding the Breeding property as tenants in common.

In the Memorandum Opinion and Order, the circuit court also made the following detailed findings of fact concerning the Landing:[5]

> [] The Landing's actual size or dimension is not definit[]e[,] as there is no known survey of the Landing itself. As a result of th[e] present litigation, Koste retained the services of Lane Engineering to establish the common boundary line between the Koste/Breeding property[,] and[,] in a survey [in] November 2011, an area is depicted as the "land as occupied,"

---

[5]At oral argument, the Breedings' counsel acknowledged that the circuit court's findings of fact were not clearly erroneous and stated that, with the exception of the date on which Koste installed a floating dock off of the Landing—as to which there was conflicting testimony from Koste—the record supports everything included in the circuit court's findings of fact.

- 4 -

consisting of .241 acres. This area includes, however, additional land [that is] not part of the Landing to the east, so one can reasonably infer that the Landing is less than .241 acres.

[] The Landing[,] as viewed by the Court on May 14th[,] is adequately depicted in several pictures taken by [the] parties. Save for a few pictures of the Landing taken by the Downes family in 1963, no other photograph[s] exist.

[] The Court's view involved an approach to the Landing from two different angles. The first approach was from the east through the Breeding gravel pit operation, traveling on four wheelers, stopping at the top of the Landing. The second approach by car started at Pealiquor Road, at the entrance to [the] Koste[] property, walking down the private roadway located slightly to the west of the common boundary line shared by the parties.

[] Approaching from either direction, one must walk down an incline to reach the Landing[,] which is essentially level with Watts Creek. A loop [that] could be characterized as a path or narrow roadway is evident. From Koste's home[,] a path slopes down to the Landing.

[] Prior to the construction of [Koste's] home, the roadway or lane on the Koste property that accesses his home connected with the head of the loop on the Landing. Construction of this road was started by [Koste's grandfather] in the late 1940s to access the Landing. In order to accommodate the need for a septic field, that portion of the roadway was abandoned[,] and the roadway now veers northwest towards Koste's home. The old roadway connecting to the loop remains somewhat visible[,] although nature has clearly reclaimed the area.

[] Several live trees stand in the middle of the loop[,] along with low lying shrubs, primarily mountain laurel, as well as a few dead trees. Chained around a beech tree is a boat. Also in the middle of the loop is a pile of decaying wood, which appears to be building material[,] as opposed to fallen or cut timber. Standing at the Landing, looking out over [Watts C]reek[,] a floating dock juts out on its eastern end. To the left or west of the Landing, the remnants of old pilings are barely visible in [Watts C]reek.

[] Prior to walking down the incline towards the Landing, approaching from the Breeding property[,] is a metal stake with an aging "No Trespassing" sign facing the Breeding property. The sign is clearly depicted on photographs . . . . Additionally[,] as depicted [i]n [] photographs . . ., there are remnants of another sign, not legible, at the eastern edge of the Landing

- 5 -

on its east as one approaches from the Breeding property.

> [Koste's grandmother], who at the time of her deposition in July 2011 was 95½ years of age, dates the placement of the signs to shortly after she and [Koste's grandfather] purchased the [Koste] property [in 1944]. [Koste's grandfather] walked the [Koste] property's boundaries with Wilbert Merriken and placed the stakes in their present location. These stakes start at the Pealiquor Road end of the boundary line and are staggered along the boundary line. [Koste's grandmother]'s visit to the [Koste] property prior to her deposition confirmed her memory of these markers.

(Record references omitted). In its analysis, the circuit court set forth additional findings

of fact concerning the Landing, as well as conclusions of law, including the following:

> According to [Koste's grandmother], the only person whose memory of the area dates back to the late 1940s, the Landing was visible[,] but not accessible[,] when she and [Koste's grandfather] purchased the [Koste] property. . . . She also remembered that construction of the road system presently visible, including the road bordering the common boundary with the Breedings, was started as early as 1945, when [Koste's grandfather] arranged to use the inmates from the local jail for labor. [Koste's grandmother] also recalled that [Koste's grandfather] cleared the Landing, creating a loop or turn-around so that boats and a pick-up truck could make its way down and back. . . .

> The testimony of both [Koste's grandmother and Koste's father], concerning the early build out of the Landing road is also corroborated by the aerial photos of the Koste property submitted by [the Breedings]. . . . Also of significance to support this Court's conclusion that the road system was built as claimed by [Koste] is the testimony of Warren Downes. Shortly after his family purchased the property when he was a teenager, he recalls [Koste's grandfather's] driving a truck to the Landing and speaking with his father. This encounter occurred sometime between 1953 and 1958. Similarly[,] in this same time period, his brother, Charles [Downes], recalled the loop at the Landing[,] which he used to reach the water in a cart pulled by a donkey.

> Regarding the use of the land, [Koste's father] began to hunt at the Landing as [young] as [seven] years old. . . . He also recalls that [Koste's grandfather] completed construction on a dock at the Landing between 1947 and 1948[,] as well as a duck blind. In that period, [Koste's grandfather] also constructed a storage box, [four feet] in height and [two] feet square[,] in the middle of the loop on the Landing in which he kept an outboard motor. In

- 6 -

1948 or 1949, [Koste's grandfather] built a larger lean-to or shed above the Landing in the area demolished only recently when [Koste] built his house. . . .

The use of the Landing as a recreational area was continuous from the late 1940s. Duck blinds were erected, succumbed to the elements[,] and were rebuilt. The dock was repaired similarly. [Koste's father] remembered [that Koste's grandfather] always kept a boat at the Landing[,] and he remembered building an [eight-]foot boat while a boy[,] which remained at the Landing. With [Koste's grandfather], he hunted, fished[,] and swam at the Landing on a regular basis, driving a '31 Ford down the road to the loop. . . .

. . . [T]he use of the Landing was continuous and without interruption from 1947 up through the end of 1989. . . . During this approximate[ly] forty[-]year period, there is no evidence that anyone else used the Landing except for the Downes[es]. They used the Landing for recreational purposes[,] such as picnicking, swimming[,] and horseback riding. Other than the testimony of Warren and Charles [Downes] that their father either built or repaired a dock, there is no evidence that they maintained the loop or otherwise took responsibility for the Landing's upkeep. There is also no evidence that they asserted ownership of the land such as placing ["]no trespass["] signs or notifying [Koste's grandfather] of his trespass.

* * *

The evidence is uncontroverted that [Koste's grandparents] acted in such a way toward the Landing consistent with the belief that the Landing was included in the conveyance of property they received by deed in 1944. Walking through the woods along the eastern edge of the property, from Pealiquor Road down to [] Watts Creek, [Koste's grandfather], following the advice of Wilbert Merriken, an attorney and a land conservationist, erected metal stakes along the boundary line as he believed it to be, all the way down to [Watts] Creek. On the posts closest to the water[,] he attached ["]no trespassing["] signs facing towards . . . the Breeding property. He not only cleared the Landing but [also] built a road going straight down to the Landing. One wonders why he would have gone to the expense and effort to build a road to the Landing and construct a connecting loop if he did not believe he had the right to use it.

. . . [Koste's grandparents'] behavior towards the Landing is consistent with ownership. In paying the yearly real estate taxes, [Koste's grandmother] believed [that] those taxes covered the Landing. [Koste's grandparents], as ostensible owners of the Landing, gave permission to others to use the

Landing throughout [Koste's grandfather]'s lifetime[,] as did [Koste and his father]. As late as 1988-89, [Koste's grandfather] maintained his belief that he owned the land, expressing his pride in the Landing to Mr. Stuart McLaughlin[,] who was the State Forrester [when Koste's grandparents] entered into [a] conservation agreement.

Except for [an] August 2010 letter[6] . . . , there is no evidence that any of the previous title owners of the Breeding property gave notice to [Koste's grandparents] of their ownership interest, or notified [Koste's grandparents] that they were trespassing on the [Breeding] property. Nor was there any evidence that these owners gave permission to [Koste's grandparents] for its use. Finally, save for testimony from Charles and Warren Downes that [their] family built a dock, there is no evidence at all that anyone other than [Koste's grandparents] maintained or improved the road or loop.

(Footnote omitted).

The Breedings appealed, and the Court of Special Appeals affirmed in an unreported

opinion. The Breedings filed a petition for a writ of *certiorari*, which this Court granted.

See Breeding v. Koste, 440 Md. 114, 99 A.3d 778 (2014).

## STANDARD OF REVIEW

Maryland Rule 8-131(c) governs review of a bench trial as follows:

When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

In Clickner, 424 Md. at 266-67, 35 A.3d at 472-73, we further explained the standard of

---

[6]In the August 2010 letter to Koste, the Breedings' counsel alleged that Koste's floating dock encroached upon the Breeding property, and that there was a problem concerning "the ownership of the" Landing because Koste's "boundary line d[id] not intersect with the Breeding line as determined by the surveyor." As to ownership of the Landing, the Breedings' counsel suggested that "an agreement should be reached with respect to ownership of part or all of the" Landing.

review under Maryland Rule 8-131(c):

> [W]e give due regard to the trial court's role as fact-finder and will not set aside factual findings unless they are clearly erroneous. The appellate court must consider evidence produced at the trial in a light most favorable to the prevailing party and if substantial evidence was presented to support the trial court's determination, it is not clearly erroneous and cannot be disturbed. Questions of law, however, require our non-deferential review. When the trial court's decision involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are legally correct. . . . Where a case involves both issues of fact and questions of law, this Court will apply the appropriate standard to each issue.

(Citations and internal quotation marks omitted) (ellipsis in original).

## DISCUSSION

### I.

The Breedings contend that the "woodlands exception," which applies to cases involving prescriptive easements, can also apply to cases involving adverse possession. Koste does not disagree, but contends that the "woodlands exception" does not apply here because the Landing is neither unimproved nor otherwise in a general state of nature. We agree with the Breedings that the "woodlands exception" applies to adverse possession where the land at issue is unimproved or otherwise in a general state of nature. We explain.

Both adverse possession and prescriptive easements are based on adverse use of another's real property for twenty years; while a prescriptive easement results in a nonpossessory interest, adverse possession results in the user obtaining title. "To establish title by adverse possession, the claimant must show possession of the claimed property for the statutory period of [twenty] years. . . . Such possession must be actual, open, notorious, exclusive, hostile, under claim of title or ownership, and continuous or uninterrupted" for

- 9 -

the twenty-year period.  White v. Pines Cmty. Improvement Ass'n, Inc., 403 Md. 13, 36, 939 A.2d 165, 178 (2008) (citations omitted) (ellipsis in original); see also Md. Code Ann., Cts. & Jud. Proc. (1973, 2013 Repl. Vol.) § 5-103(a)(1) (a twenty-year statute of limitations for "an action for recovery of possession of . . . land").  "[T]he burden of proving title by adverse possession is on the claimant. . . . In evaluating a claim, the pertinent inquiry is whether the claimant has proved the elements based on the claimant's objective manifestation of adverse use, rather than on the claimant's subjective intent."  Senez v. Collins, 182 Md. App. 300, 324, 957 A.2d 1057, 1070 (2008) (citations and internal quotation marks omitted).  As to the hostility or adverse use element of adverse possession, in Hungerford v. Hungerford, 234 Md. 338, 340-41, 199 A.2d 209, 211 (1964), we stated:

> The 'hostility' essential to acquisition of title by adverse possession does not necessarily import enmity or ill will, but rather that the claimant's possession be unaccompanied by any recognition, express or inferable from the circumstances, of the real owner's right to the land. . . . [W]here the original entry and subsequent occupancy of land was under a contract, or with the consent or permission of the owner, the possession would not be hostile or adverse and could not evolve into a subsisting title on which recovery could be had, unless the record owner had notice that the continuing possession was under a claim of right, since it is the intent with which possession is continued that gives it its character as adversary.  Moreover, since an original permissive possession is presumed to continue, there can be no change to an adversary possession in the absence of affirmative evidence of that fact.

(Citations omitted).

In contrast to adverse possession, a prescriptive easement does not result in a claimant obtaining title to real property, but rather results in a claimant obtaining a nonpossessory interest in real property—generally, a right of way over another's property. In Banks, 393 Md. at 699, 904 A.2d at 454, we described prescriptive easements as follows:

> In order to establish a[ prescriptive] easement[,] a person must make an adverse, exclusive, and uninterrupted use of another's real property for twenty years. When a person has used a right of way openly, continuously, and without explanation for twenty years[,] it is fair to presume adverse use. In such a case, the burden then shifts to the landowner to show that the use was permissive. The burden, however, will not shift if the use appears to have been by permission[.]

(Citations, brackets, emphasis, and internal quotation marks omitted). As to the element of adverse use for prescriptive easements, in <u>Banks</u>, <u>id.</u> at 709-10, 904 A.2d at 461, we found instructive our discussion of adverse use in the context of adverse possession as set forth in <u>Hungerford</u>, 234 Md. at 341, 199 A.2d at 211.

The "woodlands exception" has been described in the context of rights of way or prescriptive easements. Generally speaking, the "woodlands exception" provides that, "[w]hen an easement is claimed on land that is unimproved or in a general state of nature, there is a legal presumption that the use is by permission of the owner." <u>Clickner</u>, 424 Md. at 281, 35 A.3d at 482. This Court first recognized the "woodlands exception" in an 1865 case—<u>Day v. Allender</u>, 22 Md. 511 (1865). In <u>Day</u>, <u>id.</u> at 525-26, a case involving dedication of a road to public use, we observed that, in one case on which the claimant relied, the jury had been instructed "that the *mere use* of a *road* over unenclosed *woodland* could not confer a right of way, as a neighborhood road or private path, unless the use was shown to be adverse[.]" (Emphasis in original). In <u>Day</u>, <u>id.</u> at 526-27, we stated:

> As the presumption of a right of way arises from the exercise of a privilege adverse to the right of property, and acquiescence in the exercise of that privilege, a distinction must therefore be observed between a claim of a way through enclosed and cultivated land, and of a way over unenclosed land. In the former case, the mere use is an invasion of property and a trespass; and acquiescence or submission to the exercise of a privilege under circumstances which make it actionable, may justify the inference of a legal

- 11 -

right in the person who exercises the privilege.

(Internal quotation marks omitted).

In <u>Wilson v. Waters</u>, 192 Md. 221, 227-28, 64 A.2d 135, 137-38 (1949), a case involving a prescriptive easement, we again recognized the "woodlands exception" and stated:

> It is true that some courts have ruled that the fact that land, over which a right of way is claimed, was 'unenclosed' raises a presumption that the use was permissive. By that ruling, however, the courts have occasionally been misled to establish easements over vacant lots in urban districts, although the lots had been cleared and cared for. Thus[,] it seems that the more appropriate term in such cases is 'unimproved.'

(Citations omitted). In <u>Wilson</u>, <u>id.</u> at 228, 64 A.2d at 138, we concluded that the "woodlands exception" did not apply to the property at issue, and explained:

> [W]e think that, since the lot in question has a depth of only 150 feet, this case is not exactly like those cases in which the land over which the right of way is claimed is wild land, woodland, or other land in a general state of nature. In such cases[,] it may be presumed that use of the land is permissive, because it is the custom of neighboring owners to travel over such land for pleasure or convenience, and the owners usually make no objection to their doing so.

See also <u>Feldstein v. Segall</u>, 198 Md. 285, 295, 81 A.2d 610, 615 (1951) (In a case involving a prescriptive easement, we relied on <u>Wilson</u>, and stated: "We need not say, as has been said of unenclosed woodland or other unenclosed or unimproved land, that use of the [] land, while unenclosed, is presumed to have been permissive or not adverse." (Citations omitted)).

In <u>Leekley v. Dewing</u>, 217 Md. 54, 57, 59, 141 A.2d 696, 697, 698 (1958), a case involving a prescriptive easement, we addressed a landowner's argument that "use of the

road was permissive and not hostile," and that, in accordance with <u>Wilson</u> and <u>Feldstein</u>, "no presumption that the use was adverse arises when the way is over wild or unoccupied land." In response to the landowner's argument, we stated the following concerning the "woodlands exception":

> This has been said to be because it was the custom of neighbors to travel over such land for pleasure or convenience[,] and the owners usually made no objection to their doing so, or because the use in wild, unoccupied territory would not be apt to be brought to the actual notice of the owner so that he [or she] could object.

<u>Id.</u> at 59, 141 A.2d at 698. Ultimately, we concluded that the "woodlands exception" did not apply to the property at issue because it was not "wild or unoccupied territory[,]" explaining: "The road here involved ran from a main public road and was clearly and manifestly a regularly traveled way that ran for much of the time to a clearing[,] on which stood an inhabited dwelling[,] which was visible from the main road." <u>Id.</u> at 59, 141 A.2d at 698-99.

In <u>Forrester v. Kiler</u>, 98 Md. App. 481, 483, 487, 633 A.2d 913, 914, 916 (1993), a case involving a prescriptive easement, the Court of Special Appeals held that the trial court was correct in applying the "woodlands exception" to determine that the claimant did not have a prescriptive easement. In holding that the "woodlands exception" applied, the Court of Special Appeals explained that the right of way "passed through [] wooded, unenclosed land" and that the lot was "entirely wooded[.]" <u>Id.</u> at 487, 633 A.2d at 916.[7]

---

[7]In <u>Turner v. Bouchard</u>, 202 Md. App. 428, 447, 32 A.3d 527, 537-38 (2011), when discussing <u>Forrester</u>'s facts, the Court of Special Appeals noted that "[t]he servient estate in *Forrester* was nearly a quarter mile from the nearest county road and consisted of eight

The Court of Special Appeals also observed:

> Many of our sister states have recognized that an exception to the presumption exists when property in controversy consists of unenclosed and unimproved wild lands or woodlands. Thus, when unenclosed and unimproved wildlands or woodlands are involved, the presumption is that the use was permissive, and the burden of proving that the use was adverse or under a claim of right is upon the one asserting these rights.
>
> . . . [I]n the case of unenclosed woodlands, permission is presumed because, otherwise, an owner could not allow his [or her] neighbor to pass and repass over a trail, upon his [or her] open, unenclosed land without danger of having an adverse title successfully set against him [or her]. Moreover, a landowner who quietly acquiesces in the use of a path, or road, across his [or her] uncultivated land, resulting in no injury to him [or her], but in great convenience to his [or her] neighbor, ought not to have thereby lost his [or her] rights.

Id. at 485, 633 A.2d at 915 (citations, brackets, and internal quotation marks omitted).

In Turner v. Bouchard, 202 Md. App. 428, 435, 447-48, 32 A.3d 527, 531, 538 (2011), a case involving a prescriptive easement, the Court of Special Appeals held that the trial court was not clearly erroneous in concluding that the "woodlands exception" did not apply. In so holding, the Court of Special Appeals explained:

> [The landowner] argues that the woodlands exception applies here because: the disputed area is not visible from Big Bear Lane; due to the hilly terrain, the disputed area is not visible from lot 17; lot 17 was not developed until 2005; and lot 17 is entirely wooded and contains patches that are densely vegetated. The [trial] court disagreed. Lots 16 and 17 are quarter-acre parcels located in a subdivision with hundreds of other similar[-]sized parcels. Both lots are improved with houses and driveways, as well as less formal clearings that are used as paths to access the lake. Though some portions of lot 17 have a steep terrain and contain un-trimmed vegetation, the disputed area itself is bounded by a retaining wall and has been cleared and maintained.

---

acres of unenclosed wooded land. . . . [T]he purported prescriptive easement crossed a dense forest in a general state of nature[.]"

Id. at 447, 32 A.3d at 538.

Most recently, in Clickner, 424 Md. at 256, 35 A.3d at 466, a case involving a trial court's determination that a prescriptive easement existed on behalf of the public to a beach on Dobbins Island, we held that the trial court erred because "the beach at issue was unimproved and otherwise in a general state of nature[,]" and, thus, the proper presumption "was that public use was by permission of the owner." We explained:

> In the instant case, we are presented with the question of whether the beach on Dobbins Island is property subject to the woodlands exception. Under this exception, the long history of public use of the beach would be considered to have been presumptively permissive under the law. . . .
>
> [T]he beach on Dobbins Island is properly characterized as being "in a general state of nature." We do not hold that this is the applicable characterization of every beach, but that the consideration of other factors, such as the nature of the surrounding area, should enter into the determination. It is undisputed that the beach at issue is attached to an uninhabited, uncultivated, and undeveloped island. Indeed, the witnesses described the island [that] they frequented with adjectives such as "overgrown," "uninhabited," and "unimproved."
>
> . . . [T]his Court [] has focused not only on whether the land use was shielded from view, but [also] whether the land itself was "unimproved," or "in a general state of nature."
>
> The visibility of the use is one rationale [that] guided the common-law development of the woodlands exception. Another rationale, of particular importance in the instant case, is that owners of unimproved lands ordinarily suffer no deprivation of their rights of use and enjoyment by allowing others access to their property.
>
> . . . [T]he public's recreational use of the dry sand portion of the beach on Dobbins Island is presumed to have been a product of the *permissive* indulgence of its owners. To hold otherwise would galvanize owners into fencing or otherwise obstructing their beaches in order to avoid the assertion of public prescriptive rights, feasibly creating a barricade across Maryland's shoreline.

Id. at 284-87, 35 A.3d at 483-85 (citations omitted) (emphasis in original). We further explained that, where the "woodlands exception" applies, thereby giving rise to the presumption that use was permissive, "as a general rule, permissive use can never ripen into a prescriptive easement. As such, use that is originally permissive is presumed to continue, and there must be affirmative evidence of a change to adverse use." Id. at 288, 35 A.3d at 486 (citations, brackets, and internal quotation marks omitted). Thus, we determined that, "[b]ecause the public's use of the privately owned, dry sand portion of the beach on Dobbins Island was presumptively permissive, [the plaintiffs] had the burden to show that the use was, in fact, adverse from the outset, or that its character became adverse at a point in time sufficient to meet the twenty-year prescriptive requirement." Id. at 289, 35 A.3d at 486 (citations omitted). Because the plaintiffs had not met that burden, the trial court erred in determining that a public prescriptive easement existed. Id. at 289-90, 35 A.3d at 486-87.

After a thorough review of case law involving adverse possession and prescriptive easements, we hold that the "woodlands exception," previously applied only to prescriptive easements, also applies to adverse possession where the land at issue is unimproved or otherwise in a general state of nature.[8] We reach this conclusion based on the various

_____

[8]To be sure, at oral argument, the Breedings' counsel conceded that the Breedings did not raise an argument concerning the "woodlands exception" in or before the circuit court. As such, the issue is technically not preserved for appellate review. See Md. R. 8-131(a) ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal."). Nevertheless, we agree with the Breedings' counsel that

- 16 -

similarities between adverse possession and prescriptive easements, and the rationale underlying the application of the "woodlands exception" in cases involving prescriptive easements. "To establish title by adverse possession, the claimant must show possession of the claimed property for the statutory period of [twenty] years. . . . Such possession must be actual, open, notorious, exclusive, hostile, under claim of title or ownership, and continuous or uninterrupted." White, 403 Md. at 36, 939 A.2d at 178 (citations omitted) (ellipsis in original). Similarly, to establish a prescriptive easement, a claimant must show "adverse, exclusive, and uninterrupted use of another's real property for twenty years. . . . [W]hen a person has used a right of way openly, continuously, and without explanation for twenty years it is fair to presume adverse use." Banks, 393 Md. at 698-99, 904 A.2d at 454 (citations and internal quotation marks omitted). Thus, both adverse possession and prescriptive easements: (1) concern interests in another's real property; (2) have a twenty-year period before ripening into a claim; and (3) require possession or use that is adverse,

---

the "woodlands exception" is substantially tied to notice to the title owner and that the Breedings have consistently argued—beginning in the circuit court—that there was no notice based on the Landing's nature and characteristics. Thus, as the Honorable Sally D. Adkins observed at oral argument—and the Breedings' counsel agreed—the Breedings argued the "woodlands exception" without referring to it as such. Given the relatedness of the argument made before the circuit court and the novelty of the issue presented, in the absence of unfair prejudice to either party, and to promote the orderly administration of justice, we shall address the merits of the issues. See Jones v. State, 379 Md. 704, 713, 714, 715, 843 A.2d 778, 783, 784 (2004) (Pursuant to Maryland Rule 8-131(a), "an appellate court has discretion to excuse a waiver or procedural default and to consider an issue even though it was not properly raised or preserved by a party. . . . [When doing so], appellate courts should make two determinations . . . . First, the appellate court should consider whether the exercise of its discretion will work unfair prejudice to either of the parties. . . . Second, the appellate court should consider whether the exercise of its discretion will promote the orderly administration of justice." (Citations omitted)).

exclusive, and uninterrupted. That adverse possession and prescriptive easements are markedly similar has led this Court to rely on, as instructive, law concerning adverse possession in a case involving a prescriptive easement. See Banks, 393 Md. at 709-10, 904 A.2d at 461 (In a case involving a prescriptive easement, this Court relied on the discussion of adverse use and hostility in the context of adverse possession as addressed in Hungerford, 234 Md. at 341, 199 A.2d at 211.). In short, adverse possession and prescriptive easements share substantially the same elements, and the case law between the two is consistent to the point at which we are satisfied that extending the "woodlands exception" to adverse possession cases is the logical, common sense course of action.

The rationale behind the "woodlands exception" equally applies to adverse possession. In Wilson, 192 Md. at 228, 64 A.2d at 138, we discussed the rationale behind the "woodlands exception" as follows: "In such cases [involving wild land, woodland, or other land in a general state of nature,] it may be presumed that use of the land is permissive, because it is the custom of neighboring owners to travel over such land for pleasure or convenience, and the owners usually make no objection to their doing so." Later, in Leekley, 217 Md. at 59, 141 A.2d at 698, we explained that the "woodlands exception" existed not only "because it was the custom of neighbors to travel over such land for pleasure or convenience[,] and the owners usually made no objection to their doing so," but also "because the use in wild, unoccupied territory would not be apt to be brought to the actual notice of the owner so that he [or she] could object." And, in Forrester, 98 Md. App. at 485, 633 A.2d at 915, the Court of Special Appeals stated that, pursuant to application of the "woodlands exception," permission is presumed "because, otherwise, an

- 18 -

owner could not allow his [or her] neighbor to pass and repass over a trail, upon his [or her] open, unenclosed land without danger of having an adverse title successfully set against him [or her]." (Citations, brackets, and internal quotation marks omitted).

The rationale behind the "woodlands exception" and its presumption of permission, as it has evolved in cases involving prescriptive easements, is two-fold: (1) owners of land that is unimproved or otherwise in a general state of nature usually do not object to their neighbors traveling over such land, for either the neighbor's convenience or his or her pleasure, because the owners "ordinarily suffer no deprivation of their rights of use and enjoyment by allowing others access to their property[,]" Clickner, 424 Md. at 286, 35 A.3d at 484 (citations omitted); and (2) given the nature of woodlands, activities on land that is unimproved or otherwise in a general state of nature generally are not visible to the owner such that he or she has notice and can object, see id. at 286, 35 A.3d at 484 ("The visibility of the use is one rationale which guided the common-law development of the woodlands exception." (Citation omitted)); Leekley, 217 Md. at 59, 141 A.2d at 698 ("[U]se in wild, unoccupied territory would not be apt to be brought to the actual notice of the owner so that he [or she] could object."). This rationale applies with equal force to adverse possession cases—indeed, owners of land in a general state of nature may very well permit their neighbors not only to travel over the land by use of a right of way, but also to use the land for convenience or pleasure, perhaps for swimming, fishing, or any other recreational activity; and, given that general state of nature, the owners may not have notice of others' adverse use such that the owners can object within the twenty-year period.

Given the substantial similarities between adverse possession and prescriptive

easements, as well as the circumstance that the rationale underlying the application of the "woodlands exception" in prescriptive easement cases applies with equal force in adverse possession cases, we hold that the "woodlands exception" applies to adverse possession cases where the land is unimproved or otherwise in a general state of nature.

**II.**

Having held that the "woodlands exception" applies to adverse possession, we now explain why the "woodlands exception" does not apply under the circumstances of this adverse possession case.

The Breedings contend that the "woodlands exception" applies here because the Landing is unimproved, has never been continuously occupied for any length of time, and has been used only for a short duration for recreational activities, of which no notice was given. Koste responds that the "woodlands exception" does not apply because his grandfather continuously improved and maintained the Landing during a forty-plus-year period.

The "woodlands exception" applies to land that is unimproved or otherwise in a general state of nature. See, e.g., Clickner, 424 Md. at 285, 35 A.3d at 484 (We held that the "woodlands exception" applied because the property at issue was "'in a general state of nature[,]' . . . attached to an uninhabited, uncultivated, and undeveloped island. Indeed, the witnesses described the island [that] they frequented with adjectives such as 'overgrown,' 'uninhabited,' and 'unimproved.'"); Leekley, 217 Md. at 59, 141 A.2d at 698-99 (We held that the "woodlands exception" did not apply because the property at issue was not "wild or unoccupied territory[,]" but rather was "a regularly traveled way

- 20 -

that ran for much of the time to a clearing[,] on which stood an inhabited dwelling[,] which was visible from the main road."); Feldstein, 198 Md. at 295, 81 A.2d at 615 ("We need not say, as has been said of unenclosed woodland or other unenclosed or unimproved land, that use of the [] land, while unenclosed, is presumed to have been permissive or not adverse." (Citations omitted)); Wilson, 192 Md. at 228, 64 A.2d at 138 (We held that the "woodlands exception" did not apply because the property at issue was not "wild land, woodland, or other land in a general state of nature."); Day, 22 Md. at 526 ("[A] distinction must therefore be observed between a claim of a way through enclosed and cultivated land, and of a way over unenclosed land."); Turner, 202 Md. App. at 447-48, 32 A.3d at 538 (The Court of Special Appeals held that the "woodlands exception" did not apply because the two lots were "located in a subdivision with hundreds of other similar[-]sized parcels[,] improved with houses and driveways, as well as less formal clearings . . . used as paths to access the lake[,]" and although "some portions of [one] lot [] ha[d] a steep terrain and contain[ed] un-trimmed vegetation, the disputed area itself [wa]s bounded by a retaining wall and ha[d] been cleared and maintained."); Forrester, 98 Md. App. at 487, 633 A.2d at 916 (The Court of Special Appeals held that the "woodlands exception" applied because the right of way "passed through [] wooded, unenclosed land" and the lot was "entirely wooded[.]").

In cases involving the "woodlands exception," the terms "improved" and

"unimproved" have not been defined except through description of the properties at issue.[9]

Thus, for guidance, we turn to the dictionary definitions of those terms. Black's Law Dictionary defines "unimproved land" as "[l]and that has never been improved" and as "[l]and that was once improved but has now been cleared of all buildings and structures." Black's Law Dictionary 1568 (8th ed. 2004).[10] "Improve" is defined as "[t]o increase the value or enhance the appearance of something" and "[t]o develop (land), whether or not the development results in an increase or a decrease in value." Black's Law Dictionary 773 (8th ed. 2004).[11] "Improvement" is defined as "[a]n addition to real property, whether permanent or not; esp[ecially], one that increases its value or utility or that enhances its appearance." Black's Law Dictionary 773 (8th ed. 2004). And, "improved land" is defined as "[r]eal property that has been developed." Black's Law Dictionary 773 (8th ed. 2004). "Development," in turn, is defined as "[a] human-created change to improved or unimproved real estate, including buildings or other structures, mining, dredging, filing, grading, paving, excavating, and drilling" and as "[a]n activity, action, or alteration that

---

[9]At oral argument, Koste's counsel stated that the case law discussing the "woodlands exception" does not provide a definition of the term "improvement," and argued that "improvement" of a property is dependent on the condition and nature of the property at issue, *i.e.*, it is a case-by-case determination. At oral argument, the Breedings' counsel posited that an "improvement" "means something [that] you add to the property."

[10]Merriam-Webster similarly defines "unimproved" as "not tilled, built on, or otherwise improved for use <*unimproved* land>[.]" Unimproved, Merriam-Webster, http://www.merriam-webster.com/dictionary/unimproved.

[11]Merriam-Webster similarly defines "improved" as "to enhance in value or quality: make better" and "to increase the value of (land or property) by making it more useful for humans (as by cultivation or the erection of buildings)[.]" Improved, Merriam-Webster, http://www.merriam-webster.com/dictionary/improved.

- 22 -

changes undeveloped property into developed property." Black's Law Dictionary 482 (8th ed. 2004). What can be gleaned from these definitions is that unimproved land is undeveloped land that lacks additions that increase the land's value or utility or enhance the land's appearance. Improved land does not necessarily have a building or a structure on it; rather, improved land is simply developed land, which is land with human-created additions, such as structures and paving, that make the land more useful for humans.[12]

Applying these principles, we hold that the "woodlands exception" does not apply here because the Landing is not unimproved or otherwise in a general state of nature. The Landing is improved property; *i.e.*, it is land that has been enhanced during the forty-year period of adverse possession by human-created additions that increased the land's utility and made it more useful for humans. As the circuit court observed in its Memorandum Opinion and Order, when Koste's grandparents purchased the Koste property in the 1940s, Koste's grandfather took steps to make the Landing accessible, including constructing a road to the Landing, clearing vegetation, and creating a loop that connected to the road so that vehicles could turn around. Koste's grandfather constructed a storage box in the middle of the loop, erected duck blinds, and repaired the dock. Koste's grandfather also erected metal stakes along what he believed to be his boundary line, all the way to Watts Creek; on posts closest to the water, he attached "no trespassing" signs that faced the Breeding property. When the circuit court viewed the Landing, the old roadway connecting

---

[12]The phrase "general state of nature" also is not explicitly defined in the case law or in a dictionary; in our view, however, the phrase is understandable in context more readily than the distinctions between the terms "improved" and "unimproved."

to the loop was still "somewhat visible[,] although nature ha[d] clearly reclaimed the area." The circuit court found that a boat was chained to a tree, a floating dock jutted out from the Landing, and the old stakes and "no trespassing" signs that faced the Breeding property were still visible. Given these findings of fact, it is evident that the Landing is neither unimproved nor otherwise in a general state of nature.[13]

To be sure, the Landing is not improved by a building, but it has been improved by the additions described above. The terms "improve" and "improvement" are not limited to the construction of a building; and, significantly, as the Breedings' counsel posited at oral argument, an "improvement" simply "means something [that] you add to the property." In other words, property need not include a building to be considered "improved" if man-made additions have been added to the property to increase its value or utility or to enhance its appearance.[14]

---

[13]Koste's grandfather improved the Landing by building a road on the Koste property to the Landing, as well as a loop on the Landing itself so that vehicles could turn around; by making the Landing readily accessible from the Koste property; by constructing a storage box and duck blinds for recreational use; and by clearing vegetation. All of these improvements increased the utility of the Landing and made it more useful for Koste's grandparents and others.

[14]At oral argument, the Breedings' counsel argued that only the "no trespassing" sign and metal stakes ending at the top of the hill leading down to the Landing were visible, and that the sign and stake nearest to Watts Creek were not visible, and that it was disputed how long the sign and stake nearest to Watts Creek had been there. It is undisputed, however, that, to reach the Landing, one must walk down a hill or incline, and that, at the top of the incline approaching from the Breeding property, a metal stake with an aging "no trespassing" sign that faces the Breeding property is visible. From our perspective, the sign and stake at the top of the incline facing the Breeding property served as notice to individuals approaching from that direction that Koste's grandparents considered the Landing to be part of the Koste property; in other words, although additional signs and stakes near the water would reinforce that assertion of ownership, whether or not the sign

We briefly address the issue of notice. One of the key principles underlying the "woodlands exception" is the concern that, given the nature of woodlands, a claimant's activity on land that is unimproved or otherwise in a general state of nature is generally not visible to an owner such that he or she has notice and the opportunity to object. The Breedings contend that a claimant's recreational activity cannot, in and of itself, serve as the basis for adverse possession claims because such activity does not provide requisite notice of a claim. We need not decide this question; we are satisfied that, where recreational activities are coupled with improvements that are visible, long-standing, and indicative of a claimant's ownership, there is sufficient notice of adverse use to the owner.[15] Here, Koste's grandparents engaged in more than mere recreational activities on the Landing—Koste's grandparents made improvements in the form of visible and long-standing structures. In addition to using the Landing for recreational purposes—such as hunting, fishing, and boating—Koste's grandfather made improvements to the Landing that were visible, present for long periods of time, and indicative of his belief that he owned the Landing. Specifically, Koste's grandfather added the road and the connecting loop, duck blinds, and a storage box in the middle of the loop.[16] The loop was evident when the

_____

and stake nearest to the water were present for years or for a short time is ultimately of no consequence.

[15]Actual notice to the owner is not required. Rather, "possessory acts of dominion on the land" may be "sufficiently pronounced and continuous in nature to charge the owners . . . with notice that an adverse claim to the property was being asserted." Blickenstaff v. Bromley, 243 Md. 164, 171-72, 220 A.2d 558, 562 (1966).

[16]It is not dispositive that the Downeses, former owners of the Breeding property, may have used the Landing for recreational purposes during the prescriptive period. Indeed, as the circuit court noted, "[o]ther than the testimony of [the Downeses' sons] that

- 25 -

circuit court viewed the Landing in 2012.[17]  These improvements existed even when

Koste's grandparents were not using the Landing for recreational activities; *i.e.*, the loop

did not suddenly disappear when Koste's grandparents were not on the Landing.  In other

words, in addition to the Kostes' recreational activities, these improvements were visible

and constituted notice of adverse use to the owner and a claim of ownership by the

claimant.[18]

their father either built or repaired a dock, there is no evidence that they maintained the loop or otherwise took responsibility for the Landing's upkeep.  There is also no evidence that they asserted ownership of the land[.]"  In other words, it was Koste's grandfather who continuously improved and maintained the Landing under a claim of ownership, thereby giving notice to the owners of the Breeding property, including the Downeses, of his assertion of an adverse claim to the Landing.

[17]At oral argument, the Breedings' counsel asserted that an unpaved driveway is merely an indicia of use and not an indicia of exclusive ownership.  We disagree that the road on the Koste property and the loop on the Landing were simply indicia of use and not also indicia of ownership.  As the circuit court pointed out: "One wonders why [Koste's grandfather] would have gone to the expense and effort to build a road to the Landing and construct a connecting loop if he did not believe he had the right to use it."  Similarly, one wonders why Koste's grandfather would have thought constructing the loop was appropriate if someone else owned the Landing; presumably, most landowners would not believe that they had the right to build roads or loops on another's property.  Thus, in our view, the loop on the Landing was an indicia of both use and perceived ownership.

[18]In a sentence in the last paragraph of the Memorandum Opinion and Order, the circuit court remarked that "there [was] no evidence that any of the previous title owners of the Breeding property gave notice to [Koste's grandparents] of their ownership interest, or notified [Koste's grandparents] that they were trespassing on the" Landing.  To the extent that this comment implies that there is an affirmative burden for the owner to give notice of his or her ownership to the claimant or to tell the claimant to get off of his or her property, it is an incorrect statement of the law.  See, e.g., White, 403 Md. at 36, 939 A.2d at 178 ("To establish title by adverse possession, the claimant must show possession of the claimed property for the statutory period of [twenty] years. . . . Such possession must be actual, open, notorious, exclusive, hostile, under claim of title or ownership, and continuous or uninterrupted" for the twenty-year period.  (Citations omitted) (ellipsis in original)); Senez, 182 Md. App. at 324, 957 A.2d at 1070 ("[T]he burden of proving title by adverse possession is on the claimant."  (Citation and internal quotation marks

The circumstance that the Landing is wooded is not dispositive as to the applicability of the "woodlands exception." The Koste and Breeding properties are also wooded; alone, a land's state of being wooded does not result in automatic application of the "woodlands exception," particularly where the surrounding property—even property that is improved by houses—is also wooded. And, as explained above, although wooded, the Landing has been improved since the 1940s. That the Kostes may have lapsed in clearing brush and vegetation over the years is of no moment; the Landing remained improved despite these lapses, and did not return to a general state of nature. Additionally, the Landing is attached to the Koste property, which has been improved by houses, first the house into which Koste's grandparents moved by 1950, and then the house that Koste built in 2008. Cf. Clickner, 424 Md. at 285, 35 A.3d at 484 (We held that the "woodlands exception" applied because the property at issue was "'in a general state of nature[,]' . . . attached to an uninhabited, uncultivated, and undeveloped island. Indeed, the witnesses described the island [that] they frequented with adjectives such as 'overgrown,' 'uninhabited,' and 'unimproved.'"); Forrester, 98 Md. App. at 487, 633 A.2d at 916 (The Court of Special Appeals held that the "woodlands exception" applied because the right of

omitted)). Nonetheless, the circuit court correctly stated the law concerning the burden of proof elsewhere in the Memorandum Opinion and Order, and the circuit court applied the correct standard in concluding that Koste "established his claim to the Landing by adverse possession." The statement immediately following the remark at issue—"Nor was there any evidence that these owners gave permission to [Koste's grandparents] for its use."—is a correct statement of the law as applied to this case's facts. See, e.g., Senez, 182 Md. App. at 340, 957 A.2d at 1079-80 ("[A] claimant has the burden to prove title by adverse possession. But, once a claimant has made a satisfactory showing as to open, continuous use for the statutory period, the burden then shifts to the landowner to show that the use was permissive." (Citations, brackets, and internal quotation marks omitted)).

- 27 -

way "passed through [] wooded, unenclosed land" and the lot was "entirely wooded[.]").

Because the "woodlands exception" does not apply, no presumption of permissive use arose; instead, the burden was on the Breedings to demonstrate that the Kostes' use of the Landing was permissive. See, e.g., Clickner, 424 Md. at 281, 35 A.3d at 482 ("When an easement is claimed on land that is unimproved or in a general state of nature, there is a legal presumption that the use is by permission of the owner."); Banks, 393 Md. at 699, 904 A.2d at 454 ("When a person has used a right of way openly, continuously, and without explanation for twenty years it is fair to presume adverse use. In such a case, the burden then shifts to the landowner to show that the use was permissive." (Citations, brackets, and internal quotation marks omitted)); Senez, 182 Md. App. at 340, 957 A.2d at 1079-80 ("[O]nce a claimant has made a satisfactory showing as to open, continuous use for the statutory period [to prove title by adverse possession], the burden then shifts to the landowner to show that the use was permissive." (Citations, brackets, and internal quotation marks omitted)).

The Breedings failed to meet the burden of demonstrating permissive use.[19] As the

---

[19]In Senez, 182 Md. App. at 325-26, 957 A.2d at 1071, the Court of Special Appeals aptly noted that, in the "fact-intensive inquiry" of determining whether a claimant is in actual possession of land, "the court must consider the character and location of the land and the uses and purposes for which the land is naturally adapted." (Citations and internal quotation marks omitted). And, in Porter v. Schaffer, 126 Md. App. 237, 277, 728 A.2d 755, 775 (1999), after noting that sufficient possessory acts of ownership for uncultivated land may differ from sufficient possessory acts of ownership for cultivated, enclosed land, the Court of Special Appeals stated: "[A]cts sufficient to demonstrate possession of wild, undeveloped forest may fall short of the activity needed to establish possession of developed property." In the Memorandum Opinion and Order, the circuit court quoted this language from Porter. In our view, this is an accurate statement of the law. The

circuit court determined, there was no "evidence that the[] owners [of the Breeding property] gave permission to [Koste's grandparents] for [] use" of the Landing; rather, Koste's grandparents "acted in such a way toward the Landing consistent with the belief that the Landing was included in the conveyance of property they received by deed in 1944[,]" *i.e.*, their actions were not those of individuals who were using the Landing with the owner's permission. The circuit court considered numerous witnesses' testimony over the course of a five-day bench trial, visited the Landing in person, and reviewed numerous photographs and other exhibits. As the parties acknowledge, the circuit court's findings of fact are not clearly erroneous. See Clickner, 424 Md. at 266, 35 A.3d at 472 ("[W]e give due regard to the trial court's role as fact-finder and will not set aside factual findings unless they are clearly erroneous." (Citations omitted); Forrester, 98 Md. App. at 489, 633 A.2d at 917 ("Based on our review of the record, and on our understanding that in a bench trial it is the function of the trial judge to weigh[] conflicting evidence, we hold that his conclusion was not clearly erroneous."). We conclude that both the Court of Special Appeals and the circuit court were correct in holding that Koste obtained title to the

---

"woodlands exception" does not alter what acts may be sufficient to demonstrate possession of land—as an inquiry into the sufficiency of possessory acts involves a fact-intensive, case-by-case analysis—but instead shifts the burden in the first instance to the claimant to demonstrate that use of land to which the "woodlands exception" applies was not permissive. In other words, rather than shifting the burden to the owner to demonstrate that use was permissive, as is the case in adverse possession claims in which the "woodlands exception" does not apply, the "woodlands exception" shifts that burden to the claimant in the first instance. Stated differently, the "woodlands exception" goes to the elements of adverse or hostile use and notice, not the element of actual possession.

Landing by adverse possession.[20]

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONERS TO PAY COSTS.**

---

[20]Because we conclude that the "woodlands exception" does not apply here, we do not address the third issue that the Breedings raise—whether Koste overcame the presumption of permissive use attendant to application of the "woodlands exception." However, even if we were to conclude that the "woodlands exception" applied, the Breedings would not prevail. The record demonstrates that, even if initial use of the Landing were permissive use, Koste met the burden of showing that use of the Landing was "adverse from the outset, or that its character became adverse at a point in time sufficient to meet the twenty-year prescriptive requirement." Clickner, 424 Md. at 289, 35 A.3d at 486 (citations omitted). As the circuit court found, Koste's grandfather constructed the road to the Landing as well as the attached loop in the 1940s; he constructed a storage box in the middle of the loop; he erected duck blinds on the Landing; he repaired the dock on the Landing; he erected metal stakes along what he believed to be his property boundary line leading all the way to Watts Creek; he posted "no trespassing" signs on posts that faced the Breeding property; and he generally "acted in such a way toward the Landing consistent with the belief that the Landing was included in the conveyance of" the Koste property. Plainly put, Koste's grandfather's actions demonstrate that his use of the Landing was, indeed, hostile from the beginning, or became hostile at a point in time sufficient to satisfy the twenty-year prescriptive requirement.